# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-006

Filing Date: November 5, 2020

No. S-1-SC-38336

MICHELLE LUJAN GRISHAM,
Governor of New Mexico;
MARK R. SHEA, Secretary of the New
Mexico Department of Public
Safety; KATHYLEEN KUNKEL,
Secretary of the New Mexico
Department of Health,

       Petitioners,

v.

HONORABLE DAVID PETER REEB,
District Court Judge,
Ninth Judicial District Court,

       Respondent,

and

SID STREBECK; SSET LLC d/b/a
K-BOB'S STEAKHOUSE; JIM BURLESON;
TERRI CHRISMAN; FRONTIER AUTO, INC.;
KATHY DIAZ; CHRISTOPHER AND MICHELLE
KEMP; BODY & SOL FITNESS, LLC; KEMP'S
INVESTMENTS, LLC; SHELLY QUARTIERI;
COLFAX TAVERN & DINER, LLC; JOY
THOMPSON; and J. JONES MASSAGE,

       Real Parties in Interest.

ORIGINAL PROCEEDING

Released for Publication March 2, 2021.

Office of the Governor
Matthew L. Garcia, Chief General Counsel
Jonathan Jacob Guss, Deputy General Counsel

Santa Fe, NM

for Petitioners

Office of the Attorney General
Hector H. Balderas, Attorney General
Santa Fe, NM

for Respondent

Harrison & Hart, LLC
Carter B. Harrison, IV
Albuquerque, NM

for Real Parties in Interest

Zach Cook, LLC
Zachary J. Cook
Ruidoso, NM

for Amici Curiae
Anaheim Jacks, LLC, Papa's Pawn, LLC, Jerri Diane Rowe

Law Office of Angelo J. Artuso
Angelo J. Artuso
Albuquerque, NM

Patrick J. Rogers, LLC
Patrick J. Rogers
Albuquerque, NM

for Amici Curiae
Representative James G. Townsend, Representative Rod Montoya, New Mexico Cattle Growers Association, and New Mexico Business Coalition

**OPINION**

**NAKAMURA, Justice.**

**{1}**     Although this case involves numerous parties, intersecting statutes, and intricate arguments, the key question raised is rather straightforward: Did New Mexico's Legislature empower Petitioners to enforce public health emergency orders restricting business operations through the civil penalty provision contained in Section 12-10A-19 of the Public Health Emergency Response Act (PHERA), NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015)?  As we explain below, the answer is "yes."

## I.    BACKGROUND

**{2}**    On March 11, 2020, Governor Michelle Lujan Grisham issued an executive order that a public health emergency exists in New Mexico due to the spread of COVID-19, invoked her powers under the All Hazard Emergency Management Act (AHEMA), NMSA 1978, §§ 12-10-1 to -10 (2007), and declared a public health emergency under the PHERA, pursuant to Section 12-10A-5.  *See* State of N.M., Executive Order 2020-004 (March 11, 2020) (hereinafter "EO 2020-004").[1]  This executive order was most recently extended on October 16, 2020.  State of N.M., Executive Order 2020-072 (October 16, 2020) (hereinafter "EO 2020-072").[2]

**{3}**    Then-Secretary of the New Mexico Department of Health (DOH), Kathyleen Kunkel, citing the Governor's executive orders; the PHERA; the Public Health Act (PHA), NMSA 1978, §§ 24-1-1 to -41 (1973, as amended through 2019); the Department of Health (DOH) Act, NMSA 1978, §§ 9-7-1 to -18 (1977, as amended through 2019); and "inherent constitutional police powers," issued a series of public health emergency orders (collectively, emergency orders) which, beginning on March 16, 2020, restricted mass gatherings and the operations of certain businesses, requiring some to close entirely.  These emergency orders have been modified, but significant restrictions remain.  *See*, *e.g.*, N.M. Dep't of Health, Public Health Order at 6 (October 16, 2020) (allowing food and drink establishments to operate at only twenty-five percent of fire code capacity for indoor service).[3]

**{4}**    On May 20, 2020, approximately fourteen small businesses and business owners[4]—real parties in interest (Real Parties) in this proceeding—filed suit against Petitioners (Governor Grisham, Secretary Kunkel, and Secretary Mark R. Shea of the New Mexico Department of Public Safety) in the Ninth Judicial District.  They seek declaratory relief to the effect that the Secretary of Health's emergency orders during the COVID-19 crisis are not authorized by the PHERA, and therefore the PHERA's penalty provision (§ 12-10A-19) is inapplicable.  The Real Parties also seek an order enjoining Petitioners from "threatening" business owners and operators with penalties under the PHERA.  The complaint and attachments indicate that noncompliant businesses have been served with cease and desist orders and/or notices of violation.  These warn of the possibility of a criminal citation (under the PHA, § 24-1-21), followed by referral to the DOH pursuant to the PHERA, for a civil administrative penalty of up to $5,000 for each violation of the emergency orders.  Though some of the Real Parties have been criminally cited and/or served with a Notice of Contemplated Action (NCA) under the PHERA, there is no allegation that any of the businesses have yet paid a

[1] Available at https://www.governor.state.nm.us/wp-content/uploads/2020/03/Executive-Order-2020-004.pdf (last visited Oct. 16, 2020).

[2] Available at https://cv.nmhealth.org/wp-content/uploads/2020/10/Executive-Order-2020-072.pdf (last visited Oct. 16, 2020).

[3] Available at https://cv.nmhealth.org/wp-content/uploads/2020/10/101620-PHO.pdf (last visited Oct. 16, 2020). This emergency order was the first entered by Acting Secretary of Health Billy J. Jimenez; all prior COVID-19-related emergency orders were entered by then-Secretary of Health Kunkel.

[4] These are Sid Strebeck; SSET LLC d/b/a K-Bob's Steakhouse; Jim Burleson; Terri Chrisman; Frontier Auto, Inc.; Kathy Diaz; Christopher and Michelle Kemp; Body & Sol Fitness, LLC; Kemp's Investments, LLC; Shelly Quartieri; Colfax Tavern & Diner, LLC; Joy Thompson; and J. Jones Massage.

penalty assessed under the PHERA. Finally, the Real Parties seek alternative declaratory relief: if penalties may be levied under the PHERA, then affected business owners are also entitled to compensation under the PHERA, pursuant to Section 12-10A-15, and under "the Takings Clause for the value lost by business owners as a result of the mandated closures."

{5}    Shortly after the Real Parties filed the foregoing complaint, Petitioners asked this Court for a writ of superintending control and stay to resolve (1) whether the emergency orders temporarily restricting business operations in response to the COVID-19 pandemic are authorized by and enforceable under the PHERA (§ 12-10A-19), and (2) whether the emergency orders' business restrictions effect a taking under the PHERA's compensation provision (§ 12-10A-15) and/or the takings clauses of the United States and New Mexico Constitutions. U.S. Const. amend. V; N.M. Const. art. II, § 20. In response, the Real Parties agreed that we should address the first issue, but contended that we should decline to take jurisdiction on the takings issue, which is only an alternative and undeveloped claim in the underlying litigation. The Real Parties' response attached copies of NCAs under the PHERA that were issued to three businesses: Jalisco Café, Arroyo Vino Fine Wines, LLC, and Papa's Pawn, LLC (one of the amici curiae, listed below). According to the NCAs, the DOH intends to fine each business $5,000 per day for every day each business remained open in violation of an applicable emergency order, totaling $20,000 for Jalisco Café, $135,000 for Arroyo Vino, and $60,000 for Papa's Pawn. The NCAs also indicate that each business was either warned or given cease and desist orders and was then criminally cited, prior to the issuance of the NCAs.

{6}    A number of parties also moved to participate as amici curiae and filed conditional briefs in support of the motions: New Mexico State Representatives James G. Townsend and Rod Montoya, the New Mexico Cattle Grower's Association, and the New Mexico Business Coalition (collectively, Townsend Amici); Anaheim Jacks, LLC (Amicus Anaheim Jacks); and Papa's Pawn, LLC and Jerri Diane Rowe (collectively, Papa's Pawn Amici). This Court granted the motions of all amici on July 8, 2020.[5] The amici's briefs raise various further arguments in support of the Real Parties' contention that the PHERA does not authorize Petitioners to penalize businesses for failing to comply with the emergency orders' business restrictions.

{7}    On August 4, 2020, following oral argument, we issued an order on the writ petition. With respect to the first issue, we granted a writ of superintending control, concluding that the Legislature, through the PHERA, authorized Petitioners to respond to a public health emergency, through measures including the Secretary of Health's emergency orders temporarily restricting business operations. Petitioners may therefore utilize the PHERA's civil administrative penalty provision to enforce the Secretary of Health's emergency orders restricting business operations. On the second

---

[5]Amicus Anaheim Jacks and Papa's Pawn Amici sought to intervene in these proceedings but alternatively sought participation as amici curiae. As noted, the Court granted the latter relief.

issue, we declined to issue a writ.  In this opinion we explain in greater detail the basis for our order.

## II.   DISCUSSION

### A.   This Court's Power of Superintending Control

{8}   The New Mexico Constitution grants this Court superintending control over inferior courts.  Art. VI, § 3.  As discussed in *Kerr v. Parsons*, 2016-NMSC-028, ¶ 16, 378 P.3d 1, this power enables the Court to control the course of litigation in inferior courts, and "to correct any *specie* of error."  *Id.* (citing *Dist. Court of Second Judicial Dist. v. McKenna*, 1994-NMSC-102, ¶ 4, 118 N.M. 402, 881 P.2d 1387); *Albuquerque Gas & Elec. Co. v. Curtis*, 1939-NMSC-024, ¶ 12 43 N.M. 234, 89 P.2d 615 (explaining that this Court's superintending control "is authorized by the Constitution . . . to prevent a failure of justice by supplying a means for the correction of manifest error committed by the trial court . . . where there is no other adequate remedy and gross injustice is threatened").  This Court may make such corrections via extraordinary writs, but it employs them only in exceptional circumstances: where the remedy by appeal seems wholly inadequate; where necessary to prevent irreparable mischief, great, extraordinary, or exceptional hardship, or costly delays and unusual burdens of expense. *McKenna*, 1994-NMSC-102, ¶ 4.  We may also exercise the power of superintending control "where it is deemed to be in the public interest to settle the question involved at the earliest moment." *Griego v. Oliver*, 2014-NMSC-003, ¶¶ 11-14, 316 P.3d 865 (internal quotation marks and citation omitted) (issuing a writ of superintending control on the constitutionality of New Mexico marriage laws, noting, in part, the immediate need to resolve uncertainty regarding the issuance of marriage certificates to same-gender couples); *see McKenna*, 1994-NMSC-102, ¶¶ 4-5.  As Petitioners point out, we have expressly acknowledged the appropriateness of exercising the power of superintending control on an issue of first impression concerning "constitutional provisions with serious public safety implications."  *State ex rel. Torrez v. Whitaker*, 2018-NMSC-005, ¶ 31, 410 P.3d 201.

{9}   The first issue raised by Petitioners presents exceptional circumstances justifying this Court's issuance of a writ of superintending control.  The lawfulness of Petitioners' attempted imposition of administrative penalties upon the Real Parties for failure to comply with emergency orders during a public health emergency raises a question of public importance and public safety which would benefit from prompt resolution.  There is an obvious public interest in ensuring fair and consistent enforcement of any lawful public health measures.  Whether and how these measures may be enforced is an urgent and statewide issue, both from the perspective of Petitioners, charged with managing a public health emergency, and the Real Parties, businesses critically affected by the emergency orders.  Moreover, since the effects of the COVID-19 pandemic continue to impact New Mexico and the states surrounding it, the issue is not a passing one.  Accordingly, it is "in the public interest to settle the question" now. *Griego,* 2014-NMSC-003, ¶ 11 (internal quotation marks and citation omitted).

**{10}**   The second issue raised by Petitioners is not similarly suited for resolution by this Court.  In the district court proceeding, the Real Parties make an alternative claim under the PHERA's provision requiring compensation for "the owner of health care supplies, a health facility or any other property that is lawfully taken or appropriated by the secretary of health, the secretary of public safety or the director for temporary or permanent use during a public health emergency."  Section 12-10A-15(A).  The Real Parties also make a constitutional argument that the business restrictions amount to a regulatory or even physical taking.  Nevertheless, both the Real Parties and the Townsend Amici contend that this Court should not reach the takings claims, which lack factual development.[6]  Petitioners reply that this Court should resolve the question categorically, because under no circumstances does a temporary business closure pursuant to an emergency order effect a taking.

**{11}**   We agree that the factual allegations in support of the Real Parties' takings claims are undeveloped; it appears that some businesses were closed entirely by the emergency orders, while others have been operating on a limited basis, but the complaint offers virtually no details.  We are loath to interpret the PHERA's somewhat unusual statutory takings provision in the abstract.  We further note that constitutional regulatory takings claims generally "entail[] complex factual assessments of the purposes and economic effects of government actions."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323-34 (2002); *see also Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (holding that, when engaging in the "essentially ad hoc, factual" examination of a regulatory takings claim, "the [United States Supreme] Court's decisions have identified several factors that have particular significance[,]" including the economic impact on the claimant and the claimant's investment-backed expectations, and the "character of the governmental action").  Because the record here furnishes insufficient facts for us to resolve the Real Parties' takings claims, we decline to issue a writ on Petitioners' second issue.

**B.      Standard of Review and General Principles of Statutory Interpretation**

**{12}**   We review questions of statutory interpretation de novo.  *State v. Lucero*, 2007-NMSC-041, ¶ 8, 142 N.M. 102, 163 P.3d 489.  In construing the language of a statute, our goal and guiding principle is to give effect to the intent of the Legislature.  *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047; *see In re Portal*, 2002-NMSC-011, ¶ 5, 132 N.M. 171, 45 P.3d 891 ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals." (internal quotation marks and citation omitted)).  "[I]n determining intent we look to the language used."  *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 13, 121 N.M. 764, 918 P.2d 350.  We generally give the statutory language its "ordinary and plain meaning unless the Legislature indicates a different interpretation is necessary."  *Cooper v. Chevron U.S.A., Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61.  However, we "will not be bound by a literal interpretation of the words if such strict interpretation would defeat the intended object of the legislature."  *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 20, 117 N.M.

---

6By contrast, Amicus Anaheim Jacks and Papa's Pawn Amici argue that this Court *should* reach the takings claim under Section 12-10A-15(A).

346, 871 P.2d 1352 (internal quotation marks and citation omitted).  Thus, where statutory language is "doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction," we construe a statute "according to its obvious spirit or reason."  *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064; *Bd. of Educ. for the Carlsbad Mun. Sch. v. State Dep't of Pub. Educ.*, 1999-NMCA-156, ¶ 18, 128 N.M. 398, 993 P.2d 112 (explaining that "[a] statute is ambiguous if reasonably informed persons can understand the statute as having two or more meanings").  In ascertaining a statute's spirit or reason, we consider its history and background and read the provisions at issue "in the context of the statute as a whole," including its purposes and consequences.  *Baker*, 2013-NMSC-043, ¶ 15; *see Key*, 1996-NMSC-038, ¶ 14 ("[A]ll parts of a statute must be read together to ascertain legislative intent[,]" and "[w]e are to read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole.").

## C.     The Scope of the PHERA's Civil Penalty Provision

**{13}**     Petitioners contend that the violations of the business restrictions set forth in the Secretary of Health's emergency orders are punishable under the PHERA's civil penalty provision (§ 12-10A-19) whereas the Real Parties and all amici contend that the business restrictions are *not* authorized by the PHERA, and not enforceable thereunder. We therefore examine the relevant statutes and regulations, and the context of the orders at issue, and then turn to the parties' arguments regarding the proper interpretation of the PHERA.

### 1.     Public safety and emergency powers legislation

**{14}**     As a threshold matter, the New Mexico Legislature possesses the police power, the "broadest power possessed by governments," to protect public health and welfare. *State ex rel. City of Albuquerque v. Lavender*, 1961-NMSC-096, ¶ 24, 69 N.M. 220, 365 P.2d 652 ("Laws providing for preservation of the public peace, health and safety are essentially police measures and represent an exercise of this inherent power." (internal quotation marks and citation omitted)); *see also Chicago, Burlington, & Quincy Ry. Co. v. People of State of Illinois*, 200 U.S. 561, 592 (1906) (holding that "the police power of a state embraces regulations designed . . . to promote the public health, the public morals, or the public safety").  These powers must, of course, be delegated or enforced consistent with other constitutional requirements.  *See State v. Brooken*, 1914-NMSC-075, ¶ 12, 19 N.M. 404, 143 P. 479 (holding that pursuant to the police power the Legislature "may enact all needful laws for the benefit of society at large, within constitutional limitations"); *City of Santa Fe v. Gamble-Skogmo, Inc.*, 1964-NMSC-016, ¶¶ 19-22, 73 N.M. 410, 389 P.2d 13 (holding that the State Legislature's delegation of zoning requirements to the city of Santa Fe and its planning commission was a valid and constitutional exercise of the police power, where delegation contained reasonably adequate policy standards to guide the commission); *Am. Home Fire Assur. Co. of N.Y. v. Mid-W. Enter. Co.*, 189 F.2d 528, 531 (10th Cir. 1951) (deciding the constitutionality of a statute delegating to an administrative agency power to protect against the hazards of fire, noting that "[t]he legislature cannot delegate to an administrative tribunal or official arbitrary authority in the administration of a statute").

**{15}** Here, Petitioners enforce and administer New Mexico's legislation concerning public health emergencies under what are best described as concurrent and complementary statutes. Let us begin with the PHERA, compiled within a suite of statutes known as the Emergency Powers Code. NMSA 1978, § 12-9B-1 (2005). The PHERA's purpose is to:

>     A.      provide the state of New Mexico with the ability to manage public health emergencies in a manner that protects civil rights and the liberties of individual persons;

>     B.      prepare for a public health emergency; and

>     C.      provide access to appropriate care, if needed, for an indefinite number of infected, exposed or endangered people in the event of a public health emergency.

Section 12-10A-2. A *public health emergency* is defined as "the occurrence or imminent threat of exposure to an extremely dangerous condition or a highly infectious or toxic agent, including a threatening communicable disease, that poses an imminent threat of substantial harm to the population of New Mexico or any portion thereof." Section 12-10A-3(G). A *threatening communicable disease* is, in turn, defined as a "disease that causes death or great bodily harm that passes from one person to another and for which there are no means by which the public can reasonably avoid the risk of contracting the disease." Section 12-10A-3(L).

**{16}** The Act's subsequent provisions implement the PHERA's goals in a number of relevant ways. First, the Governor may, after consultation with the Secretary of Health, declare a public health emergency. Section 12-10A-5(A). A public health emergency is to be declared via executive order listing critical information (e.g., the nature of the public health emergency, the conditions that caused it, and the affected areas of the State, etc.). Section 12-10A-5(B).[7] Upon the Governor's declaration of a public health emergency, the Governor "shall" authorize the Secretary of Health, the Secretary of Public Safety, and the Director of Homeland Security and Emergency Management (Director) to "coordinate a response." Sections 12-10A-3(C), -5(A). To that end, the Secretary of Health (in coordination with the Secretary of Public Safety, the Director, and the State medical investigator) is granted "[s]pecial powers" in order "to protect the health, safety and welfare of the people in the state during a public health emergency." Section 12-10A-6(A), (C). Specifically, the Secretary of Health may commandeer health care facilities and/or comprehensively regulate health care supplies as necessary. Section 12-10A-6(A), (B). The State medical investigator may also coordinate with the Secretaries and Director to "implement and enforce measures to provide for the safe disposal of human remains." Section 12-10A-6(C).

---

7The Governor's order declaring a public health emergency expires after thirty days unless renewed (after consulting with the Secretary of Health). Section 12-10A-5(D)(2).

**{17}** The PHERA then contains provisions balancing the State's need to implement broad measures to contain a public health crisis with the preservation of individual liberties. For instance, the PHERA provides emergency-specific measures and procedures for isolation and quarantine, medical examination, and vaccination. Sections 12-10A-2, -7 to -13. These provisions detail both the powers of the Secretary of Health (e.g., the Secretary of Health may impose quarantine without a court order if delay would jeopardize the Secretary's ability to prevent the transmission of disease; she must then seek an ex parte order within twenty-four hours, § 12-10A-9) and the procedural protections for persons affected (e.g., the right to a hearing contesting a quarantine order within three days of a request by the quarantined person, § 12-10A-10(A)). Similarly, the PHERA both grants immunity under the Tort Claims Act to State officials who are liable for torts resulting from the officials' compliance with the PHERA, § 12-10A-14, and provides that the "state shall pay just compensation to the owner of health care supplies, a health facility or any other property that is lawfully taken or appropriated by the [S]ecretary of [H]ealth, the [S]ecretary of [P]ublic [S]afety or the [D]irector for temporary or permanent use during a public health emergency," § 12-10A-15(A).

**{18}** The Secretary of Health, in consultation with the Director and affected state agencies, "shall promulgate and implement rules that are reasonable and necessary to implement and effectuate the [PHERA]." Section 12-10A-17. Finally, the PHERA contains the following penalty provision (at issue in this litigation):

> A. The [S]ecretary of [H]ealth, the [S]ecretary of [P]ublic [S]afety or the [D]irector may enforce the provisions of the [PHERA] by imposing a civil administrative penalty of up to five thousand dollars ($5,000) for each violation of that act. A civil administrative penalty may be imposed pursuant to a written order issued by the [S]ecretary of [H]ealth, the [S]ecretary of [P]ublic [S]afety or the [D]irector after a hearing is held in accordance with the rules promulgated pursuant to the provisions of Section 12-10A-17 NMSA 1978.

> B. The provisions of the [PHERA] shall not be construed to limit specific enforcement powers enumerated in that act.

> C. The enforcement authority provided pursuant to the provisions of the [PHERA] is in addition to other remedies available against the same conduct under the common law or other statutes of this state.

Section 12-10A-19.

**{19}** The Emergency Powers Code also contains the AHEMA, which equips the Governor to direct and control the entire State of New Mexico's response to "any man-made or natural disaster causing or threatening widespread physical or economic harm that is beyond local control and requiring the resources of the state." Section 12-10-4(A). This statute explicitly authorizes the Governor to "control . . . the activities of the

homeland security and emergency management department," and "exercise direction and control over any and all state forces and resources engaged in emergency operations or related all hazard emergency management functions within the state." *Id.* The Governor is authorized "to issue, amend or rescind the necessary orders, rules and procedures to carry out the provisions of the [AHEMA]" Section 12-10-4(B)(2). Moreover, political subdivisions (i.e., local, county, and municipal governments) are required "to comply with and enforce all executive orders and rules made by the governor or under the governor's authority pursuant to law." Section 12-10-10(A).

{20} Turning to relevant statutes outside of the Emergency Powers Code, the PHA and DOH Act contain many of the underlying duties and powers of the DOH and the Secretary of Health during a response to a public health emergency. For instance (as relevant here), the DOH has authority to

> C. investigate, control and abate the causes of disease, especially epidemics, sources of mortality and other conditions of public health;
>
> D. establish, maintain and enforce isolation and quarantine;
>
> E. close any public place and forbid gatherings of people when necessary for the protection of the public health;
>
> F. respond to public health emergencies and assist communities in recovery;
>
> . . .
>
> M. bring action in court for the enforcement of health laws and rules and orders issued by the department;
>
> . . .
>
> Q. maintain and enforce rules for the control of conditions of public health importance;
>
> R. maintain and enforce rules for immunization against conditions of public health importance;
>
> . . . [and]
>
> Z. do all other things necessary to carry out its duties.

Section 24-1-3. A *condition of public health importance* is defined as "an infection, a disease, a syndrome, a symptom, an injury or other threat that is identifiable on an individual or community level and can reasonably be expected to lead to adverse health

effects in the community." Section 24-1-2(A). The PHA also contains its own quarantine and isolation procedures, which are similar to the PHERA's procedures, but more broadly applicable. *See* §§ 24-1-3(D), -15. The PHA has its own enforcement provision:

> Any person violating any of the provisions of the [PHA] or any order, rule or regulation adopted pursuant to the provisions of the [PHA] is guilty of a petty misdemeanor and shall be punished by a fine not to exceed one hundred dollars ($100) or imprisonment in the county jail for a definite term not to exceed six months or both such fine and imprisonment in the discretion of the court. Each day of a continuing violation of Subsection A of Section 24-1-5 NMSA 1978 after conviction shall be considered a separate offense. The department also may enforce its rules and orders by any appropriate civil action. . . .

Section 24-1-21.

**{21}** With respect to the Secretary of Health's authority, specifically, the DOH enabling statute provides that the Secretary, "has every power expressly enumerated in the laws, whether granted to the [S]ecretary or the [DOH] or any division of the [DOH] except where authority conferred upon any division is explicitly exempted from the [S]ecretary's authority by statute." Section 9-7-6(B). It further provides that the Secretary shall (among other things) "take administrative action by issuing orders and instructions, not inconsistent with the law, to assure implementation of and compliance with the provisions of law for which administration or execution the [S]ecretary is responsible and to enforce those orders and instructions by appropriate administrative action in the courts[.]" Section 9-7-6(B)(5).

## 2. COVID-19

**{22}** COVID-19, the disease caused by the coronavirus SARS-CoV-2, continues to spread across the United States. As of this writing, in spite of containment measures implemented here and in most other states since March 2020, 7.96 million cases of COVID-19 have been diagnosed in the United States, and 216,917 Americans have died. *See* Centers for Disease Control and Prevention, *United States COVID-19 Cases and Deaths by State* (October 16, 2020).[8] New Mexico had its first reported cases of COVID-19 on March 11, 2020, when Governor Grisham declared an emergency. *See* EO 2020-004, *supra*, at 2. By the time the Real Parties filed their complaint in district court on May 20, 2020, approximately 1.76 million cases of COVID-19 had been diagnosed in the United States, and approximately 103,700 Americans had died of the disease. *See* Centers for Disease Control, *Coronavirus Disease 2019 Case Surveillance – United States, January 22-May 30, 2020* (June 19, 2020).[9] At that time, 6,317 cases of COVID-19 had been diagnosed in New Mexico, and 283 people had

---

[8]Available at https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Oct. 16, 2020).
[9]Available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm (last visited Oct. 16, 2020).

died of the disease.  *See* N.M. Dep't of Health, *Updated New Mexico COVID-19 cases: now at 6,317* (May 20, 2020).[10]  As of this writing, COVID-19 cases diagnosed in New Mexico have increased to 34,958, and 922 people have died.  *See id.*; *see* N.M. Dep't of Health, *COVID-19 in New Mexico* (October 9, 2020).[11]  As noted hereinabove, on October 16, 2020, Governor Grisham entered the latest executive order continuing the public health emergency declared in New Mexico.  *See* EO 2020-072, *supra*.  There is no vaccine or cure for COVID-19, and preventing transmission of the disease is, to date, the only available means of averting infection.  Mayo Clinic, *Coronavirus disease 2019 (COVID-19): Diagnosis & treatment* (updated October 16, 2020);[12] U.S. Food and Drug Administration, *COVID-19 Frequently Asked Questions* (updated October 2, 2020).[13]

**{23}**    This Court may, on its own, "judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known within the [C]ourt's territorial jurisdiction, [or] (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Rule 11-201(B), (C) NMRA.  Therefore, as other courts have done, we take judicial notice of (1) the serious health risks posed by COVID-19, a "highly contagious and potentially fatal" disease, (2) the disease's transmission within New Mexico, and (3) the emergency orders issued by the Governor and Secretary of Health.  *Legacy Church, Inc. v. Kunkel*, ___ F. Supp. 3d ___ (No. CV 20-0327 JB\SCY), 2020 WL 3963764, at *102 (D.N.M. July 13, 2020) (noting that "[c]ourts presiding over similar cases have taken judicial notice of Public Health Orders and scientific consensus regarding the coronavirus" and collecting cases).

### 3.    Whether the PHERA's civil penalty provision applies to businesses violating the Secretary of Health's emergency orders

**{24}**    Petitioners contend that the PHERA's civil penalty provision is designed to ensure compliance with emergency measures taken in response to a public health emergency—including, here, the emergency orders restricting business activity in response to the COVID-19 crisis.  They assert that, although the PHERA "does not contain specific provisions contemplating business closures and restrictions as part of the State's emergency response, the PHERA[,] and by extension [its penalty provision,] was intended to encompass all measures necessary to coordinate, implement and effectuate a statewide response to a public health emergency like COVID-19."  The Real Parties counter that the PHERA's language and history do not permit so liberal an interpretation.  Moreover, they assert that the penalty provision should—like all penalty provisions—be narrowly construed to apply only where there is a violation of an express provision of the Act.  The parties' arguments really pose two questions: whether the PHERA authorizes the Secretary of Health to impose orders such as the business

---

10Available at https://cv.nmhealth.org/2020/05/20/updated-new-mexico-covid-19-cases-now-at-6317/ (last visited Oct. 16, 2020).

11Available at https://cvprovider.nmhealth.org/public-dashboard.html (last visited Oct. 16, 2020).

12Available at https://www.mayoclinic.org/diseases-conditions/coronavirus/diagnosis-treatment/drc-20479976 (last visited October 15, 2020).

13Available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-frequently-asked-questions (last visited October 15, 2020).

restrictions at issue and, secondarily, whether the civil penalty provision may be used to enforce those orders. We address these questions in turn.

### a. Whether the PHERA authorizes the Secretary of Health's emergency orders restricting business operations

**{25}** The PHERA's initial empowering provision is stated in imperative, comprehensive terms: in a public health emergency, the governor *shall* authorize the Secretaries and Director to "coordinate a response," § 12-10A-5(A). Although this language suggests a broad grant of authority from the Legislature, we acknowledge that "reasonably informed persons" may understand it to have "two or more meanings." *Bd. of Educ. for the Carlsbad Mun. Sch.*, 1999-NMCA-156, ¶ 18. Namely, is this Section merely requiring a certain procedure (e.g., authorization and coordination among the named parties), or is it empowering a substantive, coordinated response to a public health crisis? We must examine the remainder of the statute to answer this question.

**{26}** The PHERA is intended to enable New Mexico to prepare for and manage a public health emergency, while protecting individual liberties, and to ensure appropriate care for an indefinite number of infected or endangered people. Section 12-10A-2. To this end, the PHERA gives the Secretary of Health so-called "[s]pecial powers" focused on ensuring the availability of health supplies and facilities. Section 12-10A-6. The PHERA also tailors the DOH's existing authority under the PHA to address the spread of an infectious disease through vaccination, isolation and quarantine of persons (§§ 24-1-3(D), (R), -15), including measures and procedures to be used during a public health emergency, and creates due process protections for the public. *See* §§ 12-10A-7 to -16. The Secretary of Health, in consultation with the Director and affected state agencies, is directed to "promulgate and implement rules that are reasonable and necessary to implement and effectuate the [PHERA]," § 12-10A-17, and the Secretary is authorized to enforce the PHERA, § 12-10A-19. Taken together, these provisions indicate that the PHERA authorizes the Secretary of Health to coordinate (with the Governor, the Secretary of Public Safety, and the Director) a *substantive* response to a public health crisis. Section 12-10A-6(A)-(C).

**{27}** Are the enumerated measures and "[s]pecial" powers the only tools available to Petitioners under the PHERA? We think not. Less intrusive means than those enumerated in the statute are available and necessary uses of the express power to coordinate a response to a public health crisis. *See* 3 Norman J. Singer and J.D. Shambie Singer, *Sutherland Statutes & Statutory Construction*, § 65:3 at 541 (7th ed.) ("The grant of an express power carries with it the authority to exercise all other activities reasonably necessary to carry it into effect, and this has been employed with great liberality in interpreting statutes granting administrative powers."). Indeed, the Legislature's inclusion of the word *special* suggests that the powers enumerated are in addition to the general powers of the offices of Governor, Secretary of Health, Secretary of Public Safety, and Director of Homeland Security. This interpretation is consistent with the liberal construction given to statutes enacted for the protection of public health during an emergency. *Srader v. Pecos Constr. Co.*, 1963-NMSC-010, ¶ 12, 71 N.M. 320, 325, 378 P.2d 364 (holding that "ordinances enacted under the police power of a

municipality for the protection of the public health and safety . . . should be liberally construed"); *see* 3A Singer, *supra*, § 73:6 at 909 ("Legislation enacted to alleviate grave conditions which result from . . . public calamity deserves a generous interpretation so its remedial purposes may be accomplished. Courts may [take judicial notice that] an emergency does in fact exist, and . . . that a statute was enacted for emergency purposes.") (footnotes omitted); *id.* § 73:2 at 856 ("Courts have been committed for over a century to giving statutes enacted for the protection and preservation of public health an extremely liberal construction to accomplish and maximize their beneficent objectives."). We have taken judicial notice that the COVID-19 pandemic was an emergency as of March 11, 2020, and continues to be so, not only in New Mexico, but in the United States generally, and we liberally construe Petitioners' authority under the PHERA to enable the Secretary of Health and others to manage and coordinate a response to a public health emergency such as the COVID-19 pandemic. *See State v. Mountjoy*, 257 Kan. 163, 177, 891 P.2d 376 (1995) ("It is fundamental that where a statute is designed to protect the public, the language of that statute must be construed in the light of the legislative intent and purpose and is entitled to a broad interpretation so that its public purpose may be fully carried out."); *see also United States v. Antikamnia Chem. Co.*, 231 U.S. 654, 666 (1914) (noting that "[t]he fact that a council of three Secretaries of governmental departments was given power to make the rules and regulations for the execution of the law shows how complex the matters dealt with were considered to be, and the care that was necessary to be taken to guard against their defeat or perversion").

**{28}** The next question, then, is whether business restrictions, in particular, are within the scope of the Secretary of Health's authority under the PHERA. Business restrictions designed to slow and reduce the transmission of COVID-19 further the PHERA's purposes of ensuring a coordinated response to a public health emergency and providing access to healthcare for an indefinite number of people, given that "flattening" the infection curve is intended, in part, to prevent the numbers of infected and ill people from exceeding the State's healthcare capacity. *See*, *e.g.*, Ferguson, Neil M., et al., *Report 9: Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality and Healthcare Demand*, Imperial College COVID-19 Response Team (March 16, 2020);[14] N.M. Dep't of Health, Press Release, *State Re-enacts Certain Public Health Restrictions*, (July 13, 2020)[15] (discussing the importance of controlling the transmission of COVID-19 in New Mexico, in order to "flatten the curve" and avoid the rising hospitalization rates confronting neighboring states).

**{29}** The Real Parties complain that, even if the business restrictions are arguably consistent with the purposes of the PHERA, the emergency orders containing those restrictions were not lawfully issued, as they were not promulgated pursuant to the State Rules Act, NMSA 1978, §§ 14-4-1 to -11 (1967, as amended 2017), which generally governs rulemaking and requires procedures such as a public hearing (§ 14-4-5.3).

---

[14]Available at https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf (last visited Oct. 16, 2020).
[15]Available at https://cv.nmhealth.org/2020/07/13/state-re-enacts-certain-public-health-restrictions/ (last visited Oct. 16, 2020).

But, as we have said, the Secretary of Health may deploy both the special powers contained in the PHERA and the general powers of her office in response to a public health emergency. The PHA expressly authorizes the Secretary of Health to "take administrative action by issuing *orders and instructions*, not inconsistent with the law, to assure implementation of and compliance with the provisions of law for which administration or execution the secretary is responsible," § 9-7-6(B)(5) (emphasis added), and this power is distinct from, for instance, her power to promulgate procedural rules for the DOH pursuant to the ordinary rulemaking process, § 9-7-6(E). The Secretary of Health "has every power expressly enumerated in the laws, whether granted to the Secretary or the [DOH,]" § 9-7-6(B), and she may therefore "control and abate the causes of disease, especially epidemics," § 24-1-3(C), and "close any public place and forbid gatherings of people when necessary for the protection of the public health," § 24-1-3(E). Notably, in the PHA, these powers are listed *in addition to* the DOH's power to "maintain and enforce rules for the control of conditions of public health importance[.]" Section 24-1-3(Q). We therefore cannot conclude that the Legislature intended to limit the Secretary and the DOH to rulemaking in order to close public places or forbid gatherings of people; otherwise, there would be no reason to list those powers separately from the power to make rules. *See State v. Javier M.*, 2001-NMSC-030, ¶ 32, 131 N.M. 1, 33 P.3d 1 ("A statute must be construed so that no part of the statute is rendered surplusage or superfluous." (internal quotation marks and citation omitted)).

{30}  We conclude that, the Governor having declared a public health emergency and having empowered the Secretary of Health to coordinate a response to the COVID-19 crisis (*see* EO 2020-004, *supra*, ¶¶ 2-3), the Secretary was authorized (under the PHERA and the PHA, concurrently) to issue emergency orders forbidding gatherings of people to "control and abate" the transmission of COVID-19 in locales such as restaurants. Arguments that the PHERA does not so authorize the Secretary are ultimately unpersuasive.

{31}  The Real Parties argue that the plain language of the PHERA and its history demonstrate no legislative intent to give the DOH "open-ended" authority in its response to a public health emergency. The Real Parties point to the Fiscal Impact Report for the House Bill eventually enacted (with amendments) as the PHERA. *See* Fiscal Impact Report for H.B. 231, 46th Leg., 1st Sess. (N.M. 2003) [hereinafter "FIR"].[16] According to the Real Parties, the FIR lists the specific powers under the Act in a manner suggesting that such powers are "exhaustive" and emphasizes the due process protections included throughout the Act. *See id.* at 2-4. The Real Parties also note that the PHERA contains more due process safeguards than the model legislation upon which it was based (the Model State Emergency Health Powers Act, or the MSEHPA), and that the PHERA omitted the MSEHPA's provision that "the public health authority shall use every available means to prevent the transmission of infectious disease and to ensure that all cases of infectious disease are subject to proper control and treatment." *See* Centers for Disease Control and Prevention (Draft), *Model State Emergency Health*

---

16Available at https://www.nmlegis.gov/Sessions/03%20Regular/firs/hb0231.pdf (last visited Oct. 16, 2020).

*Powers Act*, § 501 (October 23, 2001).[17]  The Real Parties imply that the Legislature intended the PHERA to empower Petitioners only to undertake the measures specifically enumerated in the Act, as these are accompanied by due process protections.

**{32}**    As an initial matter, it would be absurd to interpret the PHERA as *not* empowering the Secretary of Health to undertake measures *less* intrusive or restrictive than the "[s]pecial powers" and isolation and quarantine measures described in the Act. Furthermore, while a liberal construction of public health statutes is "tempered by the mandates of equal protection and due process[,]" 3A Singer, *supra*, § 73:2 at 857 (noting that rules promulgated by public health agencies must bear a rational relationship to the purposes of the underlying legislation), the "public and social purposes served by such legislation greatly exceed the inconvenience and hardship imposed upon an individual, and therefore the former is given greater emphasis in the problem of interpretation."  *Id.* Here, the most intrusive measures (e.g., isolation, quarantine, and seizure of goods or property) are given explicit due process protections within the PHERA itself, *see* §§ 12-10A-7 to -16; even the general civil enforcement provision (discussed below) requires an administrative hearing before a fine may be imposed, §§ 12-10A-19(A); *see also* § 12-10A-17; 7.1.30 NMAC.  The Real Parties do not explain why such protections are constitutionally inadequate.

**{33}**    Furthermore, the FIR was authored by the Legislative Finance Committee; it is not an authoritative source of legislative history, but only a forecast of the fiscal impact of the proposed bill.[18]  Comparison between the PHERA and the MSEPHA also fails to alter our analysis because the Acts have countless differences; no intelligent inferences can be drawn from the provisions absent in the PHERA but present in the MSEPHA. *Compare* §§ 12-10A-1 to -19, *with* the MSEHPA, *supra*.  Nothing in the PHERA or its purposes indicates why any given MSEHPA provision was excluded.  The PHERA's exclusion of the MSEHPA's sweeping mandate that the public health authority use "every available means" to contain an infectious disease is therefore almost impossible to interpret.  *See Zuber v. Allen*, 396 U.S. 168, 185 (1969) ("Legislative silence is a poor beacon to follow in discerning the proper statutory route.").  As Petitioners point out, the Legislature may simply have deemed the MSEHPA provision either redundant or vague. *United States v. Craft*, 535 U.S. 274, 287 (2002) (noting that legislative silence/rejection of a proposed provision "lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change" (internal quotation marks and citations omitted)).

---

[17]Available at https://www.aapsonline.org/legis/msehpa.pdf (last visited Oct. 16, 2020).
[18]We need not address the broader issue (raised by the Real Parties) whether the Legislature intended to give Petitioners "open-ended" powers to respond to a public health emergency, since the business restriction orders at issue are within the powers explicitly granted to the Secretary of Health in the PHA, and since the PHERA makes mandatory the Governor's empowerment of the Secretary of Health to participate in responding to a public health emergency.

**b.      Whether the PHERA's civil penalty provision applies to violations of the emergency orders restricting business operations**

**{34}**    The next question is whether the PHERA's civil penalty provision, § 12-10A-19(A), is applicable to violations of measures other than those taken under the "[s]pecial powers" and quarantine/isolation procedures set forth in the Act.  The Secretary of Health and others may "enforce the provisions of the [PHERA] by imposing" a fine of up to $5,000 "for each violation of that Act."  Section 12-10A-19(A).

**{35}**    The Real Parties begin by arguing, from the plain language of the phrase "for each violation of that Act," that the penalty provision can only be applicable to violations of the PHERA's express requirements.  But no provision in the PHERA directs individuals to do, or refrain from doing, anything, and the PHERA declares nothing unlawful—it only conveys (as we have discussed) both broad and enumerated powers, to the Secretary of Health and others, and due process protections for the most intrusive measures.  Sections 12-10A-1 to -19.  In other words, under the Real Parties' proposed literal interpretation, there could be no violation of the PHERA.  This absurd result suggests we should instead read the provision in light of its purpose to enforce the power and authority conveyed by the PHERA.  The spirit and intent of the Act suggests that the penalty provision is applicable to *all* violations of orders and other measures lawfully exercising the powers conveyed thereunder.  *Davis*, 2003-NMSC-022, ¶ 6.

**{36}**    The Real Parties then raise the alternative argument that the rule of lenity requires a strict construction of the penalty provision.  Generally, a penal provision such as the one at issue is construed in favor of the person being penalized, although a number of courts have recognized an exception to this rule in the public health context.  *See* 3 Singer, *supra*, § 59:5 at 208-09 (noting that "laws pertaining to public health and public safety, though penal in nature, are given substantial effect" (footnotes omitted)); 3A Singer *supra*, § 73:2 at 858 ("Courts are inclined to give health statutes a liberal interpretation despite the fact that such statutes may be penal in nature and frequently may impose criminal penalties."); *see also Martin v. Herzog*, 126 N.E. 815, 816 (N.Y. 1920) ("A statute designed for the protection of human life is not to be brushed aside as a form of words, its commands reduced to the level of cautions, and the duty to obey attenuated into an option to conform.")).[19]  Regardless, the rule applies only if there is ambiguity as to the penal provision's meaning "after reviewing all sources of legislative intent."  3 Singer, *supra*, § 59:4 at 191; *see also State v. Ogden*, 1994-NMSC-029, ¶ 26, 118 N.M. 234, 880 P.2d 845 (holding that "lenity is reserved for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute" (internal quotation marks and citation omitted)).  Moreover, "strict construction is only one factor influencing interpretation of punitive legislation, and it should not be used to defeat the policy and purposes of a statute."  *Id.* ¶ 27 (explaining that, "[i]nstead, the

---

[19]Notably, Section 74:5 of 3A Singer, *supra*, cited by the Real Parties for the proposition that the rule of lenity applies even to penal statutes within a public health enactment such as the PHERA, is from the section discussing health legislation generally, not the sections discussing legislation for the protection of public health (§ 73:2) and emergency legislation (§ 73:6).

language of penal statutes should be given a reasonable or common sense construction consonant with the objects of the legislation, and the evils sought to be overcome should be given special attention").

{37}    As we have concluded, the legislative intent is to permit enforcement of all measures lawfully taken under the PHERA—not only those taken under the "[s]pecial powers" or isolation/quarantine provisions outlined. Moreover, the penalty provision itself states that the PHERA "shall not be construed to *limit* specific enforcement powers enumerated in that act[,]" and that its remedy "is *in addition* to other" existing remedies. Section 12-10A-19(B), -(C) (emphases added).[20]  These provisions weigh against the limiting construction of the penalty provision suggested by the Real Parties, and in favor of the approach advanced by Petitioners.  Furthermore, the latter provision indicates the Legislature's understanding and intention that the PHERA's authorizing/empowering provisions are *concurrent* with other applicable laws, including the PHA.

{38}    The Real Parties reply that a strict construction is nevertheless necessary because principles of separation of powers and due process require it.  They argue that, eight months ago, the average person would not likely have understood that violation of public health emergency orders were punishable/enforceable under the PHERA.  Thus, they contend that anything other than a strict/literal construction of the penalty provision would not supply adequate notice of the conduct subject to punishment, and would allow Petitioners to avoid the due process protections attending the PHERA's isolation and quarantine measures.[21]

{39}    Constitutional notice requirements are satisfied if persons of reasonable intelligence would comprehend the law at issue.  *N.M. Mining Assn. v. Water Quality Control Comm'n*, 2007-NMCA-084, ¶ 26, 142 N.M. 200, 164 P.3d 81 (also holding that "a governmental agency attempting to give notice may assume a hypothetical recipient desirous of actually being informed" (internal quotation marks and citation omitted)). Similarly, under a void-for-vagueness analysis, courts ask whether persons of average intelligence would have to guess at the meaning of a penal provision and would differ as to its application. *Bokum Res. Corp. v. N.M. Water Quality Control Comm'n*, 1979-NMSC-090, ¶ 14, 93 N.M. 546, 603 P.2d 285.  Here, we also consider, in the context of a public health emergency, that the Legislature conveyed powers under the PHERA to be used when prompt action is critical.  *Cf., Colorado State Bd. of Med. Exam'rs, Inquiry Panel v. Dist. Court of Seventh Judicial Dist., in Montrose Cty.*, 551 P.2d 194, 196 (Colo. 1976) (holding that suspension of a physician's license, before a hearing was

---

20Subsections (B) and (C) are the answer to the Real Parties' argument that the PHA makes available a "perfectly adequate penalty" (referring to Section 24-1-21) to enforce the Secretary of Health's emergency orders.  For all the reasons discussed hereinabove, the Legislature was aware of the DOH's existing powers under the PHA and intended the Secretary of Health to deploy them in responding to a public health emergency under the PHERA; it plainly intended the PHERA's penalty provision to be *in addition* to the remedy under the PHA.

21The Real Parties suggest that the civil penalty provision is unconstitutional as implemented by Petitioners  However, they do not develop this line of argument—presumably because Petitioners have, in practice, provided notice and a hearing to alleged violators and because no penalty has apparently yet been assessed to any of the Real Parties.  We therefore do not consider it.  *State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (declining to address an argument with no principled analysis or development).

held, was appropriate because there was "adequate support for the Board's conclusion" that emergency circumstances justified an immediate suspension, followed by a hearing); *Miller v. Campbell Cty.*, 945 F.2d 348, 353 (10th Cir. 1991) (holding that "where the state is confronted with an emergency, it may deprive an individual of his or her property without first providing a hearing"). The interest in providing more specific notice of the conduct subject to penalty must be balanced against the interest in conveying sufficiently flexible enforcement authority to the Secretary of Health and others to manage a public health emergency.

**{40}** The Real Parties do not contest the Secretary of Health's existing authority under the PHA to impose business restrictions to contain the transmission of a life-threatening communicable disease such as COVID-19, and to enforce those restrictions with criminal penalties. *See* §§ 24-1-3(E), (F),-15, -21. The PHERA conveys broad and concurrent authority to coordinate a response to a public health emergency, and its penalty provision is explicitly "in addition to" remedies available under other statutes or the common law. Section 12-10A-19(B), (C). Therefore, we conclude that Petitioners' proposed construction of the PHERA gives adequate notice under the circumstances of a public health emergency, to a reasonably intelligent person desirous of being informed, that its penalty provision may permit enforcement of orders issued by the Secretary of Health, consistent with her established authority to respond to public health emergencies—including through orders restricting the operation of businesses.

**{41}** The Real Parties' complaint that Petitioners have been "bypassing" the PHERA's "extensive procedural protections" to impose fines under the penalty provision overlooks the administrative hearing required by the penalty provision (§ 12-10A-19(A)), the process for which is set forth in 7.1.30 NMAC. In fact, it seems the Legislature *did* address the need for due process protections through requiring an administrative hearing before the imposition of any fine under the PHERA. Again, the Real Parties make no argument that this hearing process is constitutionally insufficient. Instead, they suggest, and the Townsend Amici more vigorously argue, that the business restrictions amount to "quarantine orders" that can only be imposed (if at all) through the procedures for isolation and quarantine of persons, set forth in the PHERA, §§ 12-10A-7 to -11 (requiring, for instance, the Secretary of Health to obtain an ex parte court order to quarantine a person), and/or the PHA, § 24-1-15. The Townsend Amici reason that the emergency orders restricting business operations are *de facto* quarantine orders, because they entail the separation of the owners and employees of businesses from their customers, and because they establish the physical place of a business as a restricted area (citing the PHA, § 24-1-15(P)(1)). The Townsend Amici contend that this reading is appropriate because the provisions of the PHA authorizing the Secretary of Health to close public areas and prohibit gatherings, and to control the transmission of communicable diseases, must be read in conjunction with quarantine and isolation provisions/requirements.

**{42}** We disagree for several reasons. Preventing gatherings of people and quarantining people are complementary but discrete methods of containing the spread of an infectious disease. Businesses have been ordered to restrict operations due to the general risk of transmission of COVID-19, an infectious and serious—in some

cases, deadly—disease, in circumstances where large groups of people are in close proximity to one another.  *See*, *e.g.*, N.M. Dep't. of Health, Public Health Order at 3 (March 16, 2020)[22]  (directing restaurants and bars to operate at fifty percent capacity, and advising New Mexicans to avoid crowded spaces, as "[y]our risk of exposure to respiratory viruses like COVID-19 may increase in crowded, closed-in settings with little air circulation if there are people in the crowd who are sick"); N.M. Dep't of Health, Public Health Order (July 13, 2020)[23] (prohibiting restaurants from providing dine-in service, but permitting delivery or carry-out service); *see also* Centers for Disease Control and Prevention, *Considerations for Restaurants and Bars* (updated September 6, 2020)[24] (discussing the highest-risk and lowest-risk settings for the spread of COVID-19 in restaurants and bars, the lowest risk being drive-through and delivery/pick-up only, and the highest risk being indoor and outdoor dining with no social distancing). Quarantine, by contrast, is a strategy to address infection or likelihood of infection in particular *persons*; the statutory language of the quarantine and isolation provisions in both the PHA and the PHERA reflects this.  *See* § 24-1-15(A) (providing that the Secretary of Health is to petition the court to isolate or quarantine a person, where the Secretary has knowledge that the person is infected with or was exposed to a threatening communicable disease, and the person has refused voluntary measures); § 12-10A-7(B) (stating under "[p]rocedures for isolation or quarantine of persons" that the ex parte quarantine order shall "state the persons, group or class of persons affected by the ex parte order"); § 12-10A-8(E) ("A household or family member of a person isolated or quarantined has a right to choose to enter an isolation or quarantine area."); § 12-10A-11(A) ("A person who is isolated or quarantined may request a hearing in court[.]").

**{43}**    Moreover, an *area of isolation or quarantine* is defined as the "physical environs that the [DOH] designates as the area within which to restrict access as required to prevent transmission of a threatening communicable disease[,]"  § 24-1-15(P)(1), and *quarantine* is defined as "the precautionary physical separation of a person who has or may have been exposed to a threatening communicable disease . . . from persons who are not quarantined to protect against the transmission of the disease to persons who are not quarantined[,]" § 24-1-15(P)(5).  Owners and employees of businesses have not been involuntarily physically separated from the public on the basis of suspected infection or exposure, nor are they confined to a certain physical area or prevented from moving about freely or interacting with others.

**{44}**    Relatedly, while the economic consequences of the business restrictions are serious, the restrictions do not compromise a person's individual freedoms in the manner of a quarantine order; therefore, the due process protections required for business restrictions are not comparable to those required for quarantine orders.  We further note that the emergency restrictions do not single out a business for "quarantine"—they classify *types* of restricted businesses.  *See*, *e.g.*, N.M. Dep't of

---

[22]Available at https://cv.nmhealth.org/wp-content/uploads/2020/03/031620-DOH-PHO-r.pdf (last visited Oct. 16, 2020).

[23]Available at https://cv.nmhealth.org/wp-content/uploads/2020/07/7.13.20-PHO-1.pdf (last visited Oct. 16, 2020).

[24]Available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/business-employers/bars-restaurants.html (last visited Oct. 16, 2020).

Health, Public Health Order at 3-6 (April 11, 2020)[25] (listing all essential businesses according to type, and allowing essential retail businesses such as grocery stores to operate at twenty percent capacity under the fire code); *see Zucht v. King*, 260 U.S. 174, 176-77 (1922) (noting that "in the exercise of the police power reasonable classification may be freely applied, and [a] regulation is not violative of the equal protection clause merely because it is not all-embracing").[26]  Finally, we reject the notion that the Legislature intended Petitioners to undertake the procedures necessary to obtain quarantine orders to restrict the operations of businesses during a pandemic. Petitioners would face an insurmountable burden if it was necessary to obtain individual orders for each New Mexico business deemed a public health risk, and the benefits of restricting gatherings of people in order to control a pandemic would be defeated.  We read statutes to effectuate, not defeat, their purposes. *Portal*, 2002-NMSC-011, ¶ 5 ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals." (internal quotation marks and citation omitted)).

## III.    CONCLUSION

**{45}**    For the foregoing reasons, we have granted a writ of superintending control ordering the district court to comply with the holding of this opinion, namely, that the PHERA's civil penalty provision may be applied to enforce the business restrictions or closures required under the Secretary of Health's emergency orders.  As explained hereinabove, we deny the request for a writ as to the takings question presented.  We have vacated our previously issued stay, and therefore the underlying litigation may proceed, as appropriate, before the district court in the Ninth Judicial District.

**{46}    IT IS SO ORDERED.**

**JUDITH K. NAKAMURA, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**BARBARA J. VIGIL, Justice**

---

25Available at https://cv.nmhealth.org/wp-content/uploads/2020/04/04_11_20_PHO_Amended.pdf (last visited Oct. 16, 2020).

26To the extent the Townsend Amici argue that the business restriction orders are void/unconstitutional because they are arbitrary and capricious applications of the Secretary of Health's authority under the PHA, they reference no law or evidence whatsoever in support of such an assertion, despite the fact that one challenging the constitutionality of administrative action bears the burden of showing that the action is arbitrary or capricious.  *The Counseling Ctr., Inc. v. N.M. Human Servs. Dep't*, 2018-NMCA-063, ¶ 32, 429 P.3d 326, 334, *cert. denied* (S-1-SC-37126, Aug. 9, 2018) ("To successfully challenge the validity of a rule adopted by an administrative agency, the party challenging the rule has the burden of showing that the rule is arbitrary or capricious by demonstrating that the rule's requirements are not reasonably related to the legislative purpose." (internal quotation marks and citation omitted)).  We therefore, again, do not consider this line of argument.  *Guerra*, 2012-NMSC-014, ¶ 21.

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**