# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-022

Filing Date: June 7, 2021

No. S-1-SC-38510

STATE OF NEW MEXICO,
KATHYLEEN KUNKEL,
in her official capacity as the
Secretary of the Department of
Health, and MICHELLE LUJAN
GRISHAM, in her official Capacity
as the Governor of New Mexico,

      Petitioners,

v.

HON. MATTHEW WILSON,
First Judicial District Court Judge,
HON. ERIN B. O'CONNELL,
Second Judicial District Court Judge,
HON. BEATRICE J. BRICKHOUSE,
Second Judicial District Court Judge,
HON. MARCI BEYER,
Third Judicial District Court Judge,
HON. JARED G. KALLUNKI,
Fifth Judicial District Court Judge,
HON. THOMAS E. LILLEY,
Fifth Judicial District Court Judge,
HON. MATTHEW G. REYNOLDS,
Seventh Judicial District Court Judge,
HON. MATTHEW E. CHANDLER,
Ninth Judicial District Court Judge,
HON. DAVID P. REEB,
Ninth Judicial District Court Judge,
HON. CURTIS R. GURLEY,
Eleventh Judicial District Court Judge, and
HON. ELLEN R. JESSEN,
Twelfth Judicial District Court Judge,

      Respondents,

and

**PEREZ ENTERPRISES, LLC, ELITE FITNESS & TANNING, LLC, COWBOY CAFE, LLC, MAD MAC, LLC, HM PROPERTIES, LLC, CAMPE2, LLC, ELI'S BISTRO, INC., DAVID HETT, SPORTS ADVENTURE, KRK PROPERTIES, LLC, ALLSTAR AUCTION CO., LLC, OOPS A DAISY FLORAL LTD., BEDONIE CASKET LTD., CO., LONE TREE, INC., MAUGER ESTATES B&B, GRAND AVENUE ENTERPRISES, LLC, HINKLE FAMILY FUN CENTER, LLC, SANTA FE OXYGEN & HEALING BAR, LLC, and APOTHECARY RESTAURANT, LLC,**

        Real Parties in Interest.

**ORIGINAL PROCEEDING**

Released for Publication July 20, 2021.

Hector H. Balderas, Attorney General
Nicholas M. Sydow, Civil Appellate Chief
Neil R. Bell, Assistant Attorney General
Erin Elizabeth Lecocq, Assistant Attorney General
Santa Fe, NM

Office of the Governor
Matthew L. Garcia, Chief General Counsel
Holly Agajanian, Chief General Counsel
Kyle P. Duffy, Associate General Counsel
Maria S, Dudley, Associate General Counsel
Santa Fe, NM

for Petitioners

Western Agriculture Resource and Business Advocates, LLP
A. Blair Dunn
Jared Robert Vander Dussen
Albuquerque, NM

for Real Parties in Interest

## OPINION

**BACON, Justice.**

{1}     The petition before the Court presents another case challenging the extent of the executive branch's actions in relation to the ongoing COVID-19 pandemic. Here, we

must determine as a matter of law whether the State's public health orders (PHOs) may support a claim for just compensation under either Article II, Section 20 of the New Mexico Constitution or Section 12-10A-15 of the Public Health Emergency Response Act (PHERA), NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015). With respect to the constitutional question, we hold that the PHOs cannot support a claim for a regulatory taking requiring compensation. With respect to the statutory question, we hold that the PHOs' restrictions on business operations regarding occupancy limits and closures cannot support a claim for just compensation. We further hold that claimants for just compensation under the PHERA must exhaust the administrative remedies set forth in Section 12-10A-15(B), (C) before seeking judicial relief.

## I.     BACKGROUND

## A.     Legislative Facts Regarding COVID-19 and the PHOs

**{2}**     As we said in *Lujan Grisham v. Romero*, this Court may take judicial notice of "a fact that is not subject to reasonable dispute because it (1) is generally known within the [C]ourt's territorial jurisdiction, [or] (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." 2021-NMSC-009, ¶ 7, 483 P.3d 545 (second alteration in original) (internal quotation marks omitted) (quoting Rule 11-201(B) NMRA); *see Fry v. Lopez*, 2019-NMSC-013, ¶ 28, 447 P.3d 1086 ("[T]his Court . . . may take judicial notice of legislative facts by resorting to whatever materials it may have at its disposal establishing or tending to establish those facts. Legislative facts are those which help the tribunal to determine the content of law and policy and to exercise its judgment or discretion in determining what course of action to take." (internal quotation marks and citations omitted)). Therefore, we take judicial notice of legislative facts relevant to this case regarding COVID-19 and the PHOs.

## 1.     COVID-19

**{3}**     In *Grisham v. Reeb*, we took notice that COVID-19, the disease caused by the coronavirus SARS-CoV-2, had been responsible nationally for 7.96 million diagnosed cases and 216,917 deaths, as of October 16, 2020. 2021-NMSC-006, ¶ 22, 480 P.3d 852. We also took notice that in New Mexico 34,958 cases had been diagnosed and 922 people had died as of October 9, 2020. *Id.* ¶ 22. As of May 3, 2021, the Centers for Disease Control records 32.2 million diagnosed cases and 573,780 deaths nationally.[1] As of May 3, 2021, the New Mexico Department of Health records that 197,733 cases have been diagnosed and 4,067 New Mexicans have died.[2]

**{4}**     Since *Reeb*, multiple vaccines have been developed, and New Mexico has an active program of vaccine distribution. New Mexico Dep't of Health, *COVID-19 Vaccine*;[3] New Mexico Dep't of Health, *State of New Mexico COVID-19 Vaccine*

---

1Available at https://covid.cdc.gov/covid-data-tracker/#cases_casesper100k last7days (last visited May 3, 2021).

2Available at https://cvprovider.nmhealth.org/public-dashboard.html (last visited May 3, 2021).

3Available at https://cv.nmhealth.org/covid-vaccine/ (last visited May 3, 2021).

*Allocation Plan* (updated January 28, 2021).[4] During the same time, however, multiple variants have been detected in the United States that seem to spread more easily and quickly than the original strain, and research as to the available vaccines' efficacy against these variants has not been finalized. Mayo Clinic, *COVID-19 variants: What's the concern?* (updated March 23, 2021).[5] No cure is available for COVID-19, and the best way to avoid the illness remains to avoid exposure. Mayo Clinic, *Coronavirus disease 2019 (COVID-19): Diagnosis & treatment* (updated April 30, 2021)[6]; U.S. Food and Drug Administration, *COVID-19 Frequently Asked Questions* (updated April 16, 2021).[7]

## 2.    The PHOs

**{5}**    As we recognized in *Reeb*, 2021-NMSC-006, ¶¶ 1-2, the Governor's executive order of March 11, 2020, pursuant to the PHERA, declared that a public health emergency exists in New Mexico due to the spread of COVID-19. *See* State of N.M., *Executive Order 2020-004* (Mar. 11, 2020).[8] This executive order was most recently extended on February 5, 2021. State of N.M., *Executive Order 2021-004* (Feb. 5, 2021).[9]

**{6}**    Beginning on March 16, 2020, a series of PHOs has restricted mass gatherings and the operations of certain businesses, requiring some to close entirely.[10] *See*, *e.g.*, N.M. Dep't of Health, *Public Health Emergency Order Limiting Mass Gatherings and Implementing Other Restrictions Due to COVID-19* at 3 (Mar. 16, 2020) (restricting operation of all "restaurants, bars, breweries, eateries, and other food service establishments" to no greater than fifty percent of maximum occupancy and of seating capacity; prohibiting all nontribal casinos and horse racing facilities and their attendant restaurants and bars from operating).[11] Subsequent PHOs have defined categories of affected businesses and established a framework of differentiated restrictions on those defined categories, "based on a county's ability to satisfy specified metrics." *See, e.g.*, N.M. Dep't of Health, *Public Health Emergency Order . . . Providing Additional Restrictions on Mass Gatherings Due to COVID-19* at 6 (July 30, 2020) (restricting operation of "close contact businesses" at up to twenty-five percent of maximum

---

4Available at https://cv.nmhealth.org/wp-content/uploads/2021/02/2021.
1.28-DOH-Phase-Guidance.pdf (last visited May 3, 2021).
5Available at https://www.mayoclinic.org/diseases-conditions/
coronavirus/expert-answers/covid-variant/faq-20505779 (last visited May 3, 2021).
6Available at https://www.mayoclinic.org/diseases-conditions/
coronavirus/diagnosis-treatment/drc-20479976 (last visited May 3, 2021).
7Available at https://www.fda.gov/emergency-preparedness-and-response/
coronavirus-disease-2019-covid-19/covid-19-frequently-asked-questions (last
visited May 3, 2021).
8Available at https://www.governor.state.nm.us/wp-content/uploads/2020/03
/Executive-Order-2020-004.pdf (last visited May 3, 2021).
9Available at https://cv.nmhealth.org/wp-content/uploads/2021/02/Executive
-Order-2021-004.pdf (last visited May 3, 2021).
10All PHOs and executive orders available at https://cv.nmhealth.org/public-health-orders-and-executive-
orders/ (last visited May 3, 2021).
11Available at https://cv.nmhealth.org/wp-content/uploads/2020/03/031620-DOH-PHO-r.pdf (last visited
May 3, 2021).

occupancy; prohibiting operation of "close-contact recreational facilities")[12]; N.M. Dep't of Health, *Public Health Emergency Order . . . to Impose County-by-County Restrictions Due to COVID-19* at 6-11 (Nov. 30, 2020) (establishing the "Red to Green" reopening framework; establishing underlying metrics of new COVID-19 incidence rate and average percent of positive COVID-19 test results).[13]

**{7}**     While the defined COVID-19 metrics and the framework for the restrictions have changed over time, the restrictions themselves have consistently manifested as operational limitations on occupancy to the extent of closure of some categories of businesses. *See*, *e.g.*, N.M. Dep't of Health, *Public Health Emergency Order . . . Amending . . . County-by-County Restrictions Due to COVID-19* at 6-13 (Feb. 24, 2021) (adding "Turquoise" to the "Red to Green" framework).[14] The PHOs have consistently included public health information relating the orders to the COVID-19 pandemic. *See, e.g.*, N.M. Dep't of Health, *Public Health Emergency Order Limiting Mass Gatherings and Implementing Other Restrictions Due to COVID-19* at 1 (Mar. 16, 2020) (describing the World Health Organization's announcement of the "novel Coronavirus Disease 2019" including the disease having "adapted to humans such that it is contagious and easily spread from one person to another")[15]; N.M. Dep't of Health, *Public Health Emergency Order . . . Amending . . . County-by-County Restrictions Due to COVID-19* at 2 (Feb. 24, 2021) (providing that confirmed cases exceed 28 million nationally and 183,000 in New Mexico; providing that related deaths exceed 500,000 nationally and 3,600 in New Mexico).[16]

## B.     Procedural History

**{8}**     On October 5, 2020, Petitioners State of New Mexico, Secretary of the Department of Health Kathyleen Kunkel, and Governor Michelle Lujan Grisham filed their verified petition for writ of superintending control and emergency request for stay in this Court. Their petition describes fourteen relevant lawsuits brought against them by small businesses and business owners[17]—real parties in interest (Real Parties) in this proceeding—then "pending before eleven district court judges in eight judicial districts across New Mexico." Petitioners' notice to this Court of October 22, 2020, identifies six additional cases alleging similar claims or counterclaims. The just compensation issue

---

[12]Available at https://cv.nmhealth.org/wp-content/uploads/2020/07/07.30.20-PHO.pdf (last visited May 3, 2021).

[13]Available at https://cv.nmhealth.org/wp-content/uploads/2020/11/113020-PHO.pdf (last visited May 3, 2021).

[14]Available at https://cv.nmhealth.org/wp-content/uploads/2021/02/022421-PHO.pdf (last visited May 3, 2021).

[15]Available at https://cv.nmhealth.org/wp-content/uploads/2020/03/031620-DOH-PHO-r.pdf (last visited May 3, 2021).

[16]Available at https://cv.nmhealth.org/wp-content/uploads/2021/02/022421-PHO.pdf (last visited May 3, 2021).

[17]These are Perez Enterprises, LLC; Elite Fitness & Tanning, LLC; Cowboy Cafe, LLC; Mad Mac, LLC; HM Properties, LLC; Campe2, LLC; Eli's Bistro, Inc.; David Hett; Sports Adventure; KRK Properties, LLC; Allstar Auction Co., LLC; Oops A Daisy Floral Ltd.; Bedonie Casket Ltd. Co.; Lone Tree, Inc.; Mauger Estates B&B; Grand Avenue Enterprises, LLC; Hinkle Family Fun Center, LLC; Santa Fe Oxygen & Healing Bar, LLC; and Apothecary Restaurant, LLC.

now before this Court is the "share[d] . . . threshold legal question" in the twenty pending cases.

**{9}** Based on substantially identical allegations, the plaintiffs (Real Parties here) in these lawsuits seek just compensation under Art. II, Section 20 and Section 12-10A-15 "as a result of [Petitioners'] total or partial takings of, and damages caused to [the Real Parties'] private property." The Real Parties allege therein that "[s]uch just compensation . . . include[s] . . . lost revenues and expenses incurred due to the seizure, limitation and closure of their businesses pursuant to the public health emergency orders of the State." The Real Parties' response to the petition acknowledges the relevant "20 pending cases" but argues that this Court should not hear the matter "without any factual development in the record."

**{10}** On November 20, 2020, we ordered briefing and granted the emergency request for a stay of current and future district court lawsuits seeking just compensation as a result of the PHOs during the pendency of this proceeding.

**{11}** In the briefing, we note that the Real Parties argue that the lack of factual development here is "almost identically as the issue was presented to this Court but declined in . . . *Reeb*." In *Reeb*, 2021-NMSC-006, ¶ 10, the Real Parties and Amici contended in responding to the petition that we should not reach their just compensation argument as it was an alternative argument in the district court lacking factual development. We agreed and declined to issue a writ on that matter, as the record "furnishe[d] insufficient facts for us to resolve the Real Parties' takings claims." *Id.* ¶ 11. The Real Parties' argument here suggests that the similar factual record should yield a similar result: that we should not issue a writ regarding their takings claims.

**{12}** However, in *Reeb*, a developed factual record would have become necessary if the Real Parties' takings claims had challenged the PHOs *as applied* to specific pieces of property, whereas here we consider only the presented *facial* question of law. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494-95 (1987) (recognizing "an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation" (citing *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295-96 (1981), for the proposition that a facial challenge does not involve the "ad hoc, factual inquiries" of an as-applied challenge)). Here, in contrast to *Reeb*, the facial question of law before us is the sole issue and has been fully briefed by both parties. For these reasons, our decision in *Reeb* to not reach the takings issue has no bearing here.

**{13}** On January 13, 2021, we heard oral argument but did not announce a decision at that time. In this opinion we explain in detail the basis for our holdings herein.

## II.     DISCUSSION

### A.     This Court's Power of Superintending Control

**{14}**     As we recently discussed in *Romero*, 2021-NMSC-009, ¶ 15, "this Court has the power of superintending control over inferior courts." N.M. Const. art. VI, § 3; *see Reeb*, 2021-NMSC-006, ¶ 8. This power enables the Court to control the course of litigation in inferior courts and "to correct any *specie* of error." *Kerr v. Parsons*, 2016-NMSC-028, ¶ 16, 378 P.3d 1 (citing *Albuquerque Gas & Elec. Co. v. Curtis*, 1939-NMSC-024, ¶¶ 7, 12-14, 43 N.M. 234, 89 P.2d 615). Our exercise of the power of superintending control is appropriate where "necessary to prevent irreparable mischief, great, extraordinary, or exceptional hardship, or costly delays and unusual burdens of expense." *Dist. Ct. of Second Jud. Dist. v. McKenna*, 1994-NMSC-102, ¶ 4, 118 N.M. 402, 881 P.2d 1387 (brackets and internal quotation marks omitted) (quoting *State ex rel. Transcon. Bus Serv., Inc. v. Carmody*, 1949-NMSC-047, ¶ 23, 53 N.M. 367, 208 P.2d 1073). We have expressly acknowledged the appropriateness of exercising the power of superintending control on an issue of first impression concerning "constitutional provisions with serious public safety implications." *State ex rel. Torrez v. Whitaker*, 2018-NMSC-005, ¶ 31, 410 P.3d 201.

**{15}**     The issue raised by Petitioners presents exceptional circumstances justifying this Court's issuance of a writ of superintending control. The potential compensability of alleged injuries caused by the PHOs raises a question of public importance that will benefit from resolution. There is an obvious public interest in ensuring fair and consistent adjudication of an issue touching the concerns of thousands of owners of business property throughout New Mexico. Regardless of result, the question of law before this Court is a statewide issue, both from the perspective of Petitioners, as defendants in each case below, charged with managing a public health emergency and stewarding the public money, and the Real Parties, businesses critically affected by the PHOs. Moreover, since the effects of the COVID-19 pandemic continue to impact New Mexico and its surrounding states, the issue is not a passing one, and it is reasonable to predict additional future cases may arise. "Accordingly, it is in the public interest to settle the question now." *Reeb*, 2021-NMSC-006, ¶ 9 (internal quotation marks and citation omitted).

### B.     Standard of Review and Principles of Statutory Construction

**{16}**     "[W]e review questions of constitutional and statutory interpretation de novo." *Romero*, 2021-NMSC-009, ¶ 23. In construing the language of a statute, our goal and guiding principle is to give effect to the intent of the Legislature. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047; *see In re Portal*, 2002-NMSC-011, ¶ 5, 132 N.M. 171, 45 P.3d 891 ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals." (internal quotation marks and citation omitted)). "[I]n determining intent we look to the language used." *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 13, 121 N.M. 764, 918 P.2d 350. We generally give the statutory language "its ordinary and plain meaning unless the [L]egislature indicates a different interpretation is necessary." *Cooper v. Chevron USA, Inc.*, 2002-NMSC-020, ¶ 16, 132

N.M. 382, 49 P.3d 61. However, we "will not be bound by a literal interpretation of the words if such strict interpretation would defeat the intended object of the [L]egislature." *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 20, 117 N.M. 346, 871 P.2d 1352 (internal quotation marks and citation omitted). Thus, where statutory language "is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction," we construe a statute "according to its obvious spirit or reason," *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064; *Bd. of Educ. for Carlsbad Mun. Schs. v. N.M. State Dep't of Pub. Educ.*, 1999-NMCA-156, ¶ 18, 128 N.M. 398, 993 P.2d 112 ("A statute is ambiguous if reasonably informed persons can understand the statute as having two or more meanings."). In ascertaining a statute's spirit or reason, we consider its history and background, and we read the provisions at issue "in the context of the statute as a whole, including [its] purposes and consequences." *Baker*, 2013-NMSC-043, ¶ 15; *Key*, 1996-NMSC-038, ¶ 14 ("[A]ll parts of a statute must be read together to ascertain legislative intent[, and w]e are to read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole." (citation omitted)).

## C.     Constitutional Claims Against the PHOs for Just Compensation

**{17}**     We first address whether the PHOs can support a claim for just compensation under Article II, Section 20.

**{18}**     Petitioners argue that the PHOs are a proper exercise of the State's police power to protect the public health. They argue such an exercise cannot constitute a taking under state and federal precedent and, therefore, the PHOs cannot support a claim for just compensation under Article II, Section 20. Petitioners argue in the alternative that, even if analyzed under regulatory takings caselaw, use regulation under the PHOs constitutes temporary and partial restrictions that are not compensable.

**{19}**     The Real Parties argue that the "unprecedent[ed]" deprivations of private property under the PHOs cannot be justified merely as "regulatory police exercise" that is ineligible for compensation. Additionally, they argue that issuance of the requested writ would improperly foreclose their ability to bring fact-specific evidence under a takings inquiry or to show that the PHOs are "unreasonable, arbitrary or capricious."

**{20}**     We begin by setting out the relevant authorities first for the State's police power and second for constitutional takings analysis. Then we apply those authorities to the PHOs.

## 1.     Authority for the State's Police Power

**{21}**     As we discussed in *Reeb*, the State's inherent police power is "the broadest power possessed by governments" and encompasses "[l]aws providing for preservation of the public peace, health and safety." 2021-NMSC-006, ¶ 14 (quoting *State ex rel. City of Albuquerque v. Lavender*, 1961-NMSC-096, ¶ 24, 69 N.M. 220, 365 P.2d 652); *see State v. Rotherham*, 1996-NMSC-048, ¶ 52, 122 N.M. 246, 923 P.2d 1131 (defining the police power as this State's "authority to provide its citizenry a safe community in which

to live"); *see also Hadacheck v. Sebastian*, 239 U.S. 394, 410 (1915) (describing the police power as "one of the most essential powers of government, one that is the least limitable. . . . [T]he imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily."); *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905) ("According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety."). "All property and property rights are held subject to the fair exercise of the police power." *Mitchell v. City of Roswell*, 1941-NMSC-007, ¶ 11, 45 N.M. 92, 111 P.2d 41. "These powers must, of course, be delegated or enforced consistent with other constitutional requirements." *Reeb*, 2021-NMSC-006, ¶ 14; *see Romero*, 2021-NMSC-009, ¶ 30 (depicting the century-long history of delegation of the police power to the executive branch to respond to health emergencies).

{22}    Courts have refrained from defining with precision the limits on this broad power, *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 530-31 (1917), beyond a standard of reasonableness, *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 594 (1962). The *Goldblatt* Court quoted *Lawton v. Steele*, 152 U.S. 133, 137 (1894), for the "classic [and] . . . still valid" statement of the rule:

> To justify the state in . . . interposing its authority in behalf of the public, it must appear—First, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.

369 U.S. at 594-95 (omissions in original) (internal quotation marks omitted)). However, the U.S. Supreme Court "has often said that debatable questions as to reasonableness are not for the courts but for the Legislature." *Goldblatt*, 369 U.S. at 595 (internal quotation marks omitted). Thus, "[i]t is the policy of the courts to uphold regulations intended to protect the public health, unless it is plain that they have no real relation to the object for which ostensibly they were enacted, and prima facie they are reasonable." *Mitchell*, 1941-NMSC-007, ¶ 13. In *Mitchell*, we upheld the decision of the city governing board to prohibit the keeping of certain animals as "a nuisance [that] endangered the public health," despite "[t]he fact that [the] plaintiffs' stable and lot were kept clean and sanitary." *Id.* ¶¶ 14-17 ("The ordinance was passed to take care of conditions that might, or probably would, exist if not enacted."). In *Gomez v. City of Las Vegas*, 1956-NMSC-021, ¶¶ 17, 23, 61 N.M. 27, 293 P.2d 984, we said that "the action of the City must stand" where we "entertain[ed] no shadow of doubt but that the [sanitation] ordinance in question . . . [wa]s a [reasonable] police measure involving the health and welfare of all members of the community." Further, this Court has upheld the destruction of contaminated grain as a reasonable exercise of the police power to protect the public health. *State v. 44 Gunny Sacks of Grain*, 1972-NMSC-033, ¶ 9, 83 N.M. 755, 497 P.2d 966.

{23}    Numerous cases affirm the principle that courts will intervene where plainly apparent evidence shows an otherwise reasonable exercise of the police power is

"arbitrarily exercised." *Hadacheck*, 239 U.S. at 409-11; *see, e.g.*, *Barber's Super Mkts., Inc. v. City of Grants*, 1969-NMSC-115, ¶ 7, 80 N.M. 533, 458 P.2d 785 ("If there is a relationship between [a public health and safety] ordinance and its purpose, then unless [the City's] determination of the best method is so arbitrary and unreasonable as to be equivalent to fraud it will not be set aside."); *Jacobson*, 197 U.S. at 28, 31, 38; *Reinman v. City of Little Rock*, 237 U.S. 171, 176-77 (1915); *cf. Eccles v. Ditto*, 1917-NMSC-062, ¶¶ 11-12, 23 N.M. 235, 167 P. 726 ("[I]f the court could judicially see that a [nuisance] statute was a mere evasion, or was framed for the purpose of individual oppression, it would be set aside as unconstitutional, but not otherwise."). In *Mitchell*, we said that we will uphold "the reasonableness of . . . public health regulations . . . unless it is plain and palpable that there is no real or substantial relation between the [regulation] and its object." 1941-NMSC-007, ¶ 16, (citing *Thomas Cusack Co.*, 242 U.S. at 530-31 (citing *Jacobson*, 197 U.S. at 30)).

**{24}** Otherwise, a reasonable exercise of the police power comports with due process. *See State ex rel. N.M. Dry Cleaning Bd. v. Cauthen*, 1944-NMSC-047, ¶ 8, 48 N.M. 436, 152 P.2d 255 (If an exercise of the police power "bears a[] reasonable or valid relation to the public safety, health or morals . . . , [then] our inquiry must end, the policy and wisdom of legislation touching such matters being of purely legislative concern."); *Miller v. Schoene*, 276 U.S. 272, 280 (1928) (Where an exercise of the police power requires a "choice [that] is unavoidable, we cannot say that its exercise, controlled by considerations of social policy which are not unreasonable, involves any denial of due process."); *see also Romero*, 2021-NMSC-009, ¶ 40 (providing modern cases that affirm the deferential review of the holding of *Jacobson*, 197 U.S. at 31, applied to Fourteenth Amendment claims regarding state action for the protection of public health).

## 2. Authority for Constitutional Takings

**{25}** Article II, Section 20 of the New Mexico Constitution states that "[p]rivate property shall not be taken or damaged for public use without just compensation." In evaluating claims under Article II, Section 20, "we turn to [both state and] federal cases for guidance, since '[o]ur state Constitution provides similar protection' to the Takings Clause in Amendment V of the United States Constitution." *Primetime Hosp., Inc. v. City of Albuquerque*, 2009-NMSC-011, ¶ 19 n.1, 146 N.M. 1, 206 P.3d 112 (second alteration in original) (quoting *Bd. of Educ., Moriarty Mun. Sch. Dist. v. Thunder Mountain Water Co.*, 2007-NMSC-031, ¶ 8, 141 N.M. 824, 161 P.3d 869). While we have not specifically stated the purpose of Article II, Section 20, the United States Supreme Court has said that "the purpose of the Takings Clause . . . is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617-18 (2001) (internal quotation marks and citation omitted).

**{26}** Takings jurisprudence distinguishes between physical takings and regulatory takings. *See, e.g.*, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321-25 (2002) (discussing the "longstanding distinction" between physical and regulatory takings). Physical takings are categorically compensable and occur "whenever the government acquires private property for a public purpose, whether the

acquisition is the result of a condemnation proceeding or a physical appropriation." *Id.* at 321; *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 431 (1982) (contrasting an "actual taking of possession and control" with a nontaking, wartime, government order "to cease operations"). Regulatory takings may occur when government regulation "prohibit[s] a property owner from making certain uses of her private property." *Tahoe-Sierra*, 535 U.S. at 321-22; *see Moongate Water Co., Inc. v. City of Las Cruces*, 2013-NMSC-018, ¶ 18, 302 P.3d 405 ("A regulatory taking . . . occurs when the government regulates the use of land, but does not condemn it, i.e., take title to the property.").

**{27}**   Regulatory takings jurisprudence began with Justice Holmes's oft-cited exposition in *Pennsylvania Coal v. Mahon*, 260 U.S. 393, 415 (1922), regarding the relationship between the police power and the Takings Clause, arriving at the general rule that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." "Nevertheless, our decision in *Mahon* offered little insight into when, and under what circumstances, a given regulation would be seen as going 'too far' for purposes of [just compensation]." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015-16 (1992) (quoting *Mahon*, 260 U.S. at 415).

**{28}**   Relevant jurisprudence since *Mahon* features disparate approaches regarding compensability while "generally eschew[ing] any set formula for determining how far is too far." *Lucas*, 505 U.S. at 1015 (internal quotation marks omitted) (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). On the one hand, many courts have recognized that regulation promoting "'the health, safety, morals, or general welfare'" is generally insulated from takings analysis and compensability. *Lucas*, 505 U.S. at 1023 (quoting *Penn Cent.*, 438 U.S. at 125); *see Tahoe-Sierra*, 535 U.S. at 329 (quoting *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 313 (1987) (recognizing that "'denial of all use [may be] insulated as a part of the State's authority to enact safety regulations'")). On the other hand, as we discuss below, the United States Supreme Court in *Lucas* also articulated a categorical rule of compensability: "Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." 505 U.S. at 1027. Otherwise, courts have "preferr[ed] to 'engag[e] in . . . essentially ad hoc, factual inquiries.'" *Id.* at 1015 (second alteration and omission in original) (quoting *Penn Cent.*, 438 U.S. at 124).

**{29}**   Such fact-intensive inquiries follow the regulatory analysis adopted in *Penn Central* ("*Penn Central* inquiries"), "designed to allow 'careful examination and weighing of all the relevant circumstances.'" *Tahoe-Sierra*, 535 U.S. at 322 (quoting *Palazzolo*, 533 U.S. at 636 (O'Connor, J., concurring)). In a *Penn Central* inquiry, the factors for determining a regulatory taking include "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (citing *Palazzolo*, 533 U.S. at 617 (citing *Penn Cent.*, 438 U.S. at 124)).

**{30}**   "[T]he nature of the State's interest in [a challenged] regulation is a critical factor in determining whether a taking has occurred, and thus whether compensation is required." *Keystone*, 480 U.S. at 488. For this principle, the *Keystone* Court cited *Mahon*'s analysis that the Kohler Act, central to claims in *Mahon*, primarily served a private interest, and neither addressed a public nuisance nor protected personal safety. *Id.* at 487-88; *see Mahon*, 260 U.S. at 413-14. In *Plymouth Coal Co. v. Pennsylvania*, 232 U.S. 531 (1914), distinguished by *Mahon*, 260 U.S. at 415, the challenged statute "dealt with 'a requirement for the *safety of employees* invited into the mine, and secured an *average reciprocity of advantage* that has been recognized as a justification of various laws.'" *Keystone*, 480 U.S. at 488 (emphasis added) (quoting *Mahon*, 260 U.S. at 415). This example in *Keystone* impliedly contrasted the noncompensable public purpose and interest in *Plymouth Coal* with the compensable private purpose and interest in *Mahon*. *See Keystone*, 480 U.S. at 488.

**{31}**   The *Keystone* Court cited "[m]any cases before and since" *Mahon* to show that "the public interest in preventing activities similar to public nuisances is a substantial one, which in many instances has not required compensation." *Keystone*, 480 U.S. at 488-92. The *Keystone* Court cited *Mugler v. Kansas*, 123 U.S. 623, 668-69 (1887), for the proposition that a "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or appropriation of property." *Keystone*, 480 U.S. at 489; *accord Penn Cent.*, 438 U.S. at 144-46 (Rehnquist, J., dissenting) (citing *Mugler*, et al. for the "nuisance exception to the taking guarantee"). An exercise of the police power under this nuisance exception, "consistent[] with the existence and safety of organized society," cannot be "'burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community.'" *Keystone*, 480 U.S. at 489 (quoting *Mugler*, 123 U.S. at 669).

**{32}**   The *Keystone* Court cited the unanimous decision in *Miller*, 276 U.S. 272,[18] for the proposition that a State's strong interest in addressing a public nuisance made "clear that the State's exercise of its police power to prevent [an] impending danger was justified, and did not require compensation." *Keystone*, 480 U.S. at 490. In *Miller*, the United States Supreme Court upheld the state entomologist's order, in accordance with Virginia's Cedar Rust Act, to destroy infected ornamental red cedars for serving the "preponderant public concern" of preventing the spread of a communicable plant disease into nearby apple orchards. 276 U.S. at 277-80. In upholding the order, the *Miller* Court concluded that there was no basis for compensation. *Id.* at 279-80.

**{33}**   The foregoing cases demonstrate "[t]he Court's hesitance to find a taking when the State merely restrains uses of property that are tantamount to public nuisances." *Keystone*, 480 U.S. at 491. Five years after *Keystone*, the *Lucas* Court narrowed the nuisance exception as it relates to noxious uses that may avoid compensation, as we

---

18The *Keystone* Court noted that the unanimity in *Miller* included Justice Holmes, five years after his exposition on regulatory takings in *Mahon*. *Keystone*, 480 U.S. at 490.

discuss below. *See Lucas*, 505 U.S. at 1027-30. That narrowing aside, the nuisance principle underlying the foregoing cases bears directly on the issue before this Court: that the police power, when properly exercised to protect the public good, both benefits and burdens each of us, "as part of the burden of common citizenship." *Id.* at 491 (quoting *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949)).

> Long ago it was recognized that "all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community," and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.

*Keystone*, 480 U.S. at 491-92 (citations omitted).

### 3.    Application of Authorities to the PHOs

**{34}**    We apply the foregoing authorities to the issue before us. First, the threshold consideration is whether the PHOs as an exercise of the State's police power are reasonably related to their stated purpose. *See Mitchell*, 1941-NMSC-007, ¶ 13. Second, if that relationship is reasonable, then the purpose of the exercise may be determinative of insulation from takings analysis, as argued by the State. *See Lucas*, 505 U.S. at 1023. If the PHOs' purpose does not warrant such insulation, claims for just compensation must be determined under fact-specific, case-intensive scrutiny, as argued by the Real Parties. *See Penn Cent.*, 438 U.S. at 124. Finally, regardless of the purpose served, an otherwise proper regulatory exercise of the police power may be found to violate the categorical rule of compensability articulated in *Lucas*. *See Lucas*, 505 U.S. at 1027. However, use restrictions that otherwise violate *Lucas* may inhere in the affected property's title under established principles of state property and nuisance law. *See id.* at 1027, 1029. We address these considerations in turn, applying the parties' arguments as relevant.

### a.    Reasonableness analysis

**{35}**    Regulation under the police power that does not bear a reasonable relationship to the object for which it was enacted will be "deemed . . . invalid." *See Jacobson*, 197 U.S. at 28.

**{36}**    We first observe that *Reeb* and *Romero* considered the underlying components for this analysis: the PHOs themselves and the context of the public health emergency that they address. *See Reeb*, 2021-NMSC-006, ¶¶ 22-23, 25-46; *Romero*, 2021-NMSC-009, ¶¶ 2-7, 24-35. In both cases, the State's "'inherent constitutional police powers'" were foundational to the authorities under scrutiny. *Reeb*, 2021-NMSC-006, ¶ 3 (quoting N.M. Dep't of Health, *Public Health Order Limiting Mass Gatherings and Implementing Other Restrictions Due to COVID-19*, *supra* note 11, at 1-2 (Mar. 16, 2020)); *Romero*, 2021-NMSC-009, ¶ 4 (same). Any infirmity in the exercise of those powers would be material to our analysis, and our rulings in those cases impliedly found no such infirmity. Yet because circumstances change, so too does the necessary showing for a

conclusion of reasonableness. However, we note that these prior cases have engaged in relevant judicial inquiry regarding earlier stages of the public health emergency. Thus, the notice and inquiry of the previous cases are informative but not dispositive.

**{37}** The Real Parties do not contest the State's authority to take public health measures to address "an emergent crisis that justified to a certain extent drastic measures." Citing *Jacobson*, 197 U.S. at 31, the Real Parties also concede that "COVID-19 is certainly a grave concern, just like smallpox was." However, citing *Mahon*, 260 U.S. at 413, they contend that the extent of "diminution" of property values raises doubt as to whether the PHOs "go too far." The Petitioners argue that the PHOs' restrictions on mass gatherings and business operations are reasonable exercises of the police power that necessarily "seek to limit the spread of COVID-19 by reducing the number of people in particular spaces and limiting person-to-person interaction and non-essential outings."

**{38}** Considering all available facts before the Court, including legislative facts, we agree with Petitioners. Applying the first prong of the rule for reasonableness in *Lawton*, it is reasonable to conclude that the COVID-19 crisis "require[s] such interference" as the PHOs' restrictions provide.[19] *See Lawton*, 152 U.S. at 137. Given the contagious nature of the disease and considering current information, including the promise of vaccines and the concerns of variants, the PHOs' efforts to reduce the spread of the disease continue to be reasonably related to the public health emergency. Applying the second prong, the "means" of the PHOs' restrictions "are reasonably necessary for the accomplishment of" reducing the transmission of the disease. *Id.* Occupancy limits and closure of certain categories of businesses, while certainly harsh in their economic effects, are directly tied to the reasonable purpose of limiting the public's exposure to the potentially life-threatening and communicable disease, and thus can be deemed "reasonably necessary."

**{39}** Accordingly, we find the PHOs to be a reasonable exercise of the police power to protect the public health.

**{40}** The Real Parties also argue that "whether or not the [PHOs] are arbitrary and capricious is a fact specific inquiry that requires looking at the data relied upon by the government to see if it supports a rational speculation or instead results in an irrational speculation." They invite the Court to apply its test announced in *State ex rel. State Highway Dep't v. Kistler-Collister Co.*, 1975-NMSC-039, ¶ 21, 88 N.M. 221, 539 P.2d 611, for expenses or loss of business occasioned by the government's road construction, a test that includes consideration of whether the government was "unreasonable, arbitrary or capricious." They argue this test is suitable since both the

---

19*Miller* recognized that when a state is "under the necessity of making a choice" between injuries, [i]t would have been none the less a choice if . . . the state, by doing nothing, had permitted serious injury . . . to go on unchecked. When forced to such a choice the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another which, in the judgment of the legislature, is of greater value to the public.

276 U.S. at 279.

PHOs' restrictions here and the road construction considered in *Kistler-Collister* involve "loss of access of the public to . . . businesses." *See id.* ¶¶ 20-22.

**{41}**    We decline the invitation. The foregoing authorities on the police power and constitutional takings provide ample consideration of the issues attendant in matters of a public health emergency, and we do not apply *Kistler-Collister* in that context. While the conditions of interference with access to business bear some relationship to the PHOs' occupancy limitations and closures, the differences make the comparison inapposite. The circumstances of a public health emergency merit special consideration beyond that of the everyday exercise of the police power regarding street construction. *See id.* ¶ 22 ("The inconvenience and damage which a property owner suffers from these temporary obstructions are incident to city life and must be endured." (internal quotation marks and citation omitted)). Emergency does not remove concerns of constitutionality from regulation, as we will discuss further, nor does it "create power." *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425-26 (1934) ("Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed." (internal quotation marks and citation omitted)). However, the weight and urgency of the government's decisions in a public health crisis warrant the greater consideration demonstrated in the foregoing authorities on the police power and constitutional takings. *See, e.g., Reeb*, 2021-NMSC-006, ¶ 27 (quoting *Srader v. Pecos Constr. Co.*, 1963-NMSC-010, ¶ 12, 71 N.M. 320, 378 P.2d 364 ("'[O]rdinances enacted under the police power . . . for the protection of the public health and safety . . . should be liberally construed.'") (second omission in original)); Section 12-10A-3(G) (defining a *public health emergency* as "the occurrence or imminent threat of exposure to an extremely dangerous condition or a highly infectious or toxic agent, including a threatening communicable disease, that poses an imminent threat of substantial harm to the population of New Mexico or any portion thereof"); *Jacobson*, 197 U.S. at 28 (recognizing the "acknowledged power of a local community to protect itself against an epidemic threatening the safety of all"). Without more, we will not change our jurisprudence to equate a public health emergency with street construction.

**{42}**    Regarding claims that the PHOs are arbitrary or capricious, the foregoing authorities on the police power and constitutional takings also stand for the proposition that judicial inquiry into whether an exercise of the police power "to protect the public health . . . has no real or substantial relation to [its stated] objects" is never foreclosed. *Jacobson*, 197 U.S. at 31. However, the Real Parties bear the burden in this or any other such proceeding to show plain and palpable evidence thereof. Future parties should take into account that we have now thrice found that the State has broad powers to act in the face of grave threats such as COVID-19. *See Reeb*, 2021-NMSC-006, ¶¶ 1, 45; *Romero*, 2021-NMSC-009, ¶¶ 1, 35. At this point plaintiffs bear a heavy burden to produce evidence—or at least make offers of proof—sufficient to raise questions of material fact as to whether the State's actions are objectively improper or arbitrary and capricious as a matter of public health science. *See, e.g., Jacobson*, 197 U.S. at 28 (recognizing that "an acknowledged power of a . . . community to protect itself against an epidemic threatening the safety of all might be exercised" in a "mode . . . not justified by the necessities of the case"); *Romero*, 2021-NMSC-009, ¶¶ 42-44 (citing *Jacobson*,

197 U.S. at 30-31) (concluding that the affidavit of the Real Parties' proponent-expert was not sufficient to create a question of fact requiring a trial on the merits). Otherwise, we will uphold the reasonableness of the exercise.

**{43}** In *Romero*, we specifically addressed whether the July 13, 2020, PHO's temporary ban on indoor dining was arbitrary and capricious. 2021-NMSC-009, ¶¶ 1, 36-44. The real parties in *Romero* challenged whether the ban justifiably singled out indoor dining and whether the ban was the rational product of an administrative "'winnowing and sifting process.'" *Id.* ¶ 36. The real parties in *Romero* also asserted that such an inquiry "is fact-dependent and requires review of the whole record," thus warranting remand for an evidentiary hearing. *Id.* We noted "that 'where there is room for two opinions, the action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached.'" *Id.* ¶ 38 (brackets omitted) (quoting *Old Abe Co. v. N.M. Mining Comm'n*, 1995-NMCA-134, ¶ 10, 121 N.M. 83, 908 P.2d 776). Sufficient evidence was presented to the Court in *Romero* to show a real and substantial relation between the specific order's temporary prohibition and the object of controlling and suppressing the spread of COVID-19. *Id.* ¶¶ 41, 43. We concluded, therefore, that the real parties' criticisms would not suffice to meet their burden to refute the sufficiency even if bolstered by further evidentiary development. *Id.* ¶ 43. "This Court may not second-guess the wisdom or efficacy of the . . . Order merely because reasonable minds may differ about the best approach to suppressing community transmission of COVID-19." *Id.*

**{44}** For the foregoing reasons, the Real Parties' arguments do not avail them. We hold that the current PHOs are a reasonable exercise of the police power to protect the public health.

### b. Insulation analysis

**{45}** Reasonable regulation under the police power may be insulated from just compensation claims depending on the purpose served by the regulation. *Lucas*, 505 U.S. at 1022-23. If the regulation is not so insulated, then a *Penn Central* inquiry is applied. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).

**{46}** The Real Parties do not contest that the purpose underlying the PHOs is to protect the public health. They nonetheless argue that a fact-specific *Penn Central* inquiry should not be foreclosed for any of the plaintiffs in the underlying pending cases. The Real Parties also argue that this Court should neither apply a "diminished, overly deferential, level of constitutional review" nor "simply ratify decisions reached under different circumstances" in order to justify a denial of compensation. The Real Parties cite *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2605 (2020) (mem.) (Alito, J., dissenting), for the proposition that "as States have time to craft policies in light of [increasing medical and scientific] evidence, courts should expect policies that more carefully account for constitutional rights." Petitioners argue that valid exercises of the police power to protect the public health cannot support a takings claim and that *Penn Central* is inapposite. The Real Parties' arguments fail for two reasons.

**{47}** First, as discussed above,[20] a reasonable use regulation under the police power to prevent injury to the health of the community "'cannot . . . be deemed a taking.'" *Keystone*, 480 U.S. at 489 (quoting *Mugler*, 123 U.S. at 668-69). This nuisance exception occurs when the government "prevent[s] a property owner from using his property to injure others without having to compensate the owner for the value of the forbidden use." *Penn Cent.*, 438 U.S. at 144-45 (Rehnquist, J., dissenting).[21]

> "Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the State that its use by any one, for certain forbidden purposes, is prejudicial to the public interests."

*Id.* (quoting *Mugler*, 123 U.S. at 668-69). Since "there is no 'taking'" where this exception applies, *id.*, the PHOs, as reasonable use regulation to prevent injury to the public health, are insulated from further takings analysis.[22] Thus, the Real Parties' arguments for *Penn Central* inquiries below cannot avail them at this time.[23]

**{48}** Second, the presumably temporary nature of the PHOs' restrictions is also relevant. While the COVID-19 crisis may seem interminable, the Real Parties do not advance an argument that the public health emergency and its attendant restrictions are permanent in nature. As informed by the parties' briefing and the legislative facts herein, we conclude that the current state of affairs does not require us to consider permanence.

**{49}** In a case with facts similar to ours, the Pennsylvania Supreme Court concluded that a regulatory taking had not been shown, based on the temporary nature of COVID-19-related use restrictions combined with their public health and safety purpose. *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 895-96 (Pa. 2020), *cert. denied*, 141 S. Ct. 239

---

[20]*See* discussion of *Keystone*, paragraphs 31-33 *supra*.

[21]To distinguish the regulation in *Penn Central* as a compensable taking, Justice Rehnquist first examined "two exceptions where the destruction of property does *not* constitute a taking," the first of which was the nuisance exception. 438 U.S. at 144-45. Though in dissent, we cite his recitation as it reflects precedent.

[22]Also relevant to the PHOs, the dissent examined another takings "exception[] where the destruction of property does *not* constitute a taking," *Penn Cent.*, 438 U.S. at 144 (Rehnquist, J., dissenting), which may be termed the *broad applicability* exception. This exception applies "[e]ven where the government prohibits a noninjurious use . . . if the prohibition applies over a broad cross section of land and thereby 'secure[s] an average reciprocity of advantage.'" *Id.* at 147 (second alteration in original) (quoting *Mahon*, 260 U.S. at 415). As in zoning, such use restrictions "at times reduce[] *individual* property values, [but] the burden is shared relatively evenly and it is reasonable to conclude that on the whole an individual who is harmed by one aspect of the [restriction] will be benefited by another." *Id.* Under this theory, the PHOs benefit as well as burden those harmed by their broad applicability.

[23]We note that our cases have stated that the regulatory takings test in New Mexico for claims under Article II, Section 20 is the *Temple Baptist Church* test. *See, e.g.*, *Premier Trust of Nevada, Inc. v. City of Albuquerque*, 2021-NMCA-004, ¶¶ 20-21, 482 P.3d 1261 (quoting *Temple Baptist Church, Inc. v. City of Albuquerque*, 1982-NMSC-055, ¶ 27, 98 N.M. 138, 646 P.2d 565); *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293 (1982) ("[A] state court is entirely free to read its own State's constitution more broadly than this Court reads the Federal Constitution, or to reject the mode of analysis used by this Court in favor of a different analysis of its corresponding constitutional guarantee.").

(2020) (citing *Tahoe-Sierra*, 535 U.S. at 318, 342 (affirming the determination that "no . . . taking had occurred" where regulations had only a temporary impact on petitioners' fee interest)) (quoting *Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57, 63 (3d Cir. 2013) (holding that the government's "'emergency action to temporarily close the Market [to abate the danger posed by unexploded artillery shells] . . . constituted an exercise of its police power that did not require just compensation'")). The *Danny DeVito* Court stated that "the public health rationale for imposing the restrictions . . . to suppress the spread of the virus throughout the [state] is a stop-gap measure and, by definition, temporary." 227 A.3d at 896. In contrast, we highlight that both *Mahon* and *Lucas*, oft-cited regulatory takings cases, were predicated on the permanent nature of the property deprivations at hand. *See Mahon*, 260 U.S. at 414 (stating the Kohler Act "has very nearly the same effect for constitutional purposes as appropriating or destroying [the property right]"); *Lucas*, 505 U.S. at 1012 ("[A]s the Act then read, the taking was unconditional and permanent.").

**{50}** To be clear, we agree with the Real Parties that courts cannot simply ratify the decisions of the coordinate branches of government. As we have already discussed, it is the duty of the judiciary to "give effect to the Constitution" by exercising judicial review of legislative and executive actions that are "beyond all question, . . . plain, palpable invasion[s] of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. Even during a public health emergency, the judiciary cannot write a blank check to the executive branch or legislative branch. The checks on power herein are critical to the judiciary's role in scrutinizing exercises of the police power, and, in this case, they must incorporate developments in medical and scientific evidence in relation to the State's exercised policies. It is in this light that we have taken judicial notice of changes over time regarding the PHOs and the circumstances of the public health emergency. Our reasonableness conclusion herein incorporates those changed realities.

**{51}** However, the only question for this stage of analysis is whether the uncontested public health purpose of the PHOs insulates those orders against takings analysis. As we have established, the answer is "yes."

**c.** *Lucas* **analysis**

**{52}** As referred to above, regulation, regardless of the purpose served, may support a claim for just compensation if it violates the categorical rule in *Lucas* that a taking occurs where an owner loses all economically beneficial use of a property. *Lingle*, 544 U.S. at 538. However, use restrictions that otherwise violate this categorical rule may inhere in the property's title under established principles of state property and nuisance law, *Lucas*, 505 U.S. at 1029, thereby constituting "regulatory deprivations that do not require compensation," *id.* at 1026.

**{53}** The Real Parties argue under *Lucas* only that too expansive an application of the police power would create "essentially a limitless exception" in contravention of the categorical rule. Petitioners cite *Tahoe-Sierra*, 535 U.S. at 332, to argue that the PHOs are partial, temporary use restrictions that cannot meet the *Lucas* standard for "regulation [that] permanently deprives property of all value."

**{54}** The facial question before us requires that we contemplate what allegations against the PHOs could support a claim for just compensation under Article II, Section 20. The *Lucas* Court expressly considered "*Mahon*'s affirmation of limits to the noncompensable exercise of the police power," 505 U.S. at 1026, in announcing its categorical rule, concluding that "regulations that prohibit all economically beneficial use of land" are compensable, *id.* at 1029, "no matter how weighty the asserted 'public interests' involved," *id.* at 1028. Therefore, a claim against the PHOs alleging total deprivation of use could survive a motion to dismiss, despite the unlikeliness of proving permanent deprivation against temporary restrictions.

**{55}** However, as we have discussed, the *Lucas* Court expressly identified an exception for use prohibitions that inhere in the title of property under background state law principles of both public and private nuisance. *See id.* at 1029. The *Lucas* Court analogized this public nuisance exception to the corporate owner of a nuclear power generating plant being directed by the State to remove all improvements upon discovery of an underlying earthquake fault. *Id.* "Such regulatory action may well have the effect of eliminating the land's only economically productive use, but it does not proscribe a productive use that was previously permissible under relevant property and nuisance principles." *Id.* at 1029-30. Thus, Article II, Section 20 does not require compensation "when an owner is barred from putting land to a use that is proscribed by [our relevant] existing rules or understandings." *Id.* at 1030 (internal quotation marks and citation omitted).

**{56}** New Mexico's background principles of public nuisance law clearly affirm the power of the State to prevent injurious use applicable to the PHOs. *See generally State ex rel. Marron v. Compere*, 1940-NMSC-041, ¶ 10, 44 N.M. 414, 103 P.2d 273 (acknowledging as well established "that injunctive relief may be employed to protect the public health, morals, safety and welfare from irreparable injury by a public nuisance"); *State ex rel. Vill. of Los Ranchos v. City of Albuquerque*, 1994-NMSC-126, ¶ 52, 119 N.M. 150, 889 P.2d 185 (describing a public nuisance as an "unreasonable interference with a right common to the general public" that may affect "any number of citizens" insofar "as the nuisance will interfere with those who come in contact with it in the exercise of a public right or [insofar as] it otherwise affects the interests of the community at large" (internal quotation marks and citation omitted)). Many cases support the proposition that New Mexico's existing rules and understandings regarding public nuisance principles include the government's authority to proscribe uses injurious to the public generally. *E.g.*, *Gomez*, 1956-NMSC-021, ¶ 20 (acknowledging that "the removal of . . . noxious and unwholesome matter . . . tends directly to promote the public health, comfort, and welfare" (internal quotation marks and citation omitted)); *Town of Gallup v. Constant*, 1932-NMSC-036, ¶ 21, 36 N.M. 211, 11 P.2d 962 (recognizing "[t]he right of the state, or its governmental agencies, within reasonable limits to thus declare a certain thing, or a certain use of property, a public nuisance, in the interest of the public safety and welfare"); *Colonias Dev. Council v. Rhino Envtl. Servs.*, 2005-NMSC-024, ¶¶ 31-34, 138 N.M. 133, 117 P.3d 939 (discussing the relationship of public nuisance to the public health under the Solid Waste Act).

**{57}** Based on our clearly established background principles of state nuisance law, the public nuisance exception to the categorical rule in *Lucas* would apply to a claim against the PHOs alleging total deprivation of all beneficial use.

**{58}** For the foregoing reasons, a *Lucas* claim against the PHOs cannot avail the Real Parties.

### d. Conclusion

**{59}** We conclude that the use restrictions under the PHOs as currently constituted cannot support a claim for just compensation under Article II, Section 20.

### D. Statutory Claims for Just Compensation Against the PHOs

**{60}** We next address whether the PHOs can support a claim for just compensation under Section 12-10A-15(A), the "compensation" provision of the PHERA. Section 12-10A-2 states the purposes of the PHERA:

> A. provide the state of New Mexico with the ability to manage public health emergencies in a manner that protects civil rights and the liberties of individual persons;
>
> B. prepare for a public health emergency; and
>
> C. provide access to appropriate care, if needed, for an indefinite number of infected, exposed or endangered people in the event of a public health emergency.

The compensation provision states in its entirety:

> The state shall pay just compensation to the owner of health care supplies, a health facility or *any other property* that is lawfully taken or appropriated by the secretary of health, the secretary of public safety or the director for temporary or permanent use during a public health emergency. The amount of compensation due shall be calculated in the same manner as compensation due for taking of property pursuant to nonemergency eminent domain procedures, as provided by the Eminent Domain Code; provided that the amount of compensation calculated shall include lost revenues and expenses incurred due to the taking or appropriating of property, including a health facility.

Section 12-10A-15A (emphasis added). At issue is the legislative meaning of "any other property."

**{61}** Petitioners argue that the rules of statutory construction direct an interpretation of the compensation provision that limits "other property" to "property taken by the State and used to provide health care pursuant to the emergency powers in Section 12-10A-

6." Applying our construction rule of ejusdem generis, Petitioners argue that the scope of "other property" as a general term was intended by the Legislature to be bounded by the nature of its preceding specific terms: "health care supplies" and "health facility." Petitioners argue that this interpretation serves the purpose of the PHERA: "the protection of public health during an emergency." *Reeb*, 2021-NMSC-006, ¶ 27. Petitioners also argue that legislative intent does not abide in a broad interpretation of the compensation provision that would result in "potentially catastrophic liability" for governmental actions that are specifically enumerated in the statute. Finally, Petitioners argue that Section 12-10A-15(B) requires claimants to exhaust available administrative remedies through the Attorney General before seeking judicial relief under Section 12-10A-15(A).

**{62}** The Real Parties argue that this Court should construe the compensation provision broadly to correspond with our interpretation in *Reeb* of the PHERA's penalty provision. The Real Parties cite our statement that such a broad "interpretation is consistent with the liberal construction given to statutes enacted for the protection of public health during an emergency." *Reeb*, 2021-NMSC-006, ¶ 27 (citing *Srader*, 1963-NMSC-010, ¶ 12). They argue that a broad reading of the compensation provision would harmonize with our reading of the statute as a whole, thus "facilitat[ing] [the PHERA's] operation and the achievement of [its] goals." The Real Parties also argue that Petitioners' narrow reading under ejusdem generis "would potentially yield an absurd result" in precluding the State from taking or appropriating potentially necessary property outside the statutory definitions of health care supplies and health facility, e.g., a cold storage facility or refrigerated truck. Finally, the Real Parties allege that administrative process as specified under Section 12-10A-15(B) is "[c]learly [f]utile" as "it is inarguable that [the] Attorney General has not already made his preliminary determination."

**{63}** We determine that the Legislature intended for "any other property" to be a functional catch-all limited by the related use of "health care supplies" and "health facility." Our determination is based in application of our statutory construction rules, analysis of the PHERA's obvious spirit or reason, and weighing the PHERA's purposes and consequences. We also determine that claimants under Section 12-10A-15(A) must first exhaust administrative remedies under Section 12-10A-15(B).

1.      **Rules of statutory construction direct an interpretation of "any other property" that is limited by the series "health care supplies" and "health facility"**

**{64}** Ejusdem generis is both a common law rule of construction, *see State v. Off. of the Pub. Def. ex rel. Muqqddin*, 2012-NMSC-029, ¶¶ 29-31, 285 P.3d 622 (defining and applying ejusdem generis), and a statutory rule under Section 12-2A-20(A) of our Uniform Statute and Rule Construction Act, NMSA 1978, Sections 12-2A-1 to 12-2A-20 (1997). Section 12-2A-20(A) directs that

(1)      the meaning of a word or phrase may be limited by the series of words or phrases of which it is a part; and

(2)	the meaning of a general word or phrase following two or more specific words or phrases may be limited to the category established by the specific words or phrases.

We presume that the Legislature knew of the existence of Section 12-2A-20(A) when enacting Section 12-10A-15 in 2003. *See State v. Marquez*, 2008-NMSC-055, ¶ 7, 145 N.M. 1, 193 P.3d 548 ("When the Legislature enacts a statute, we presume that it is aware of existing statutes."); *accord. Inc. County of Los Alamos v. Johnson*, 1989-NMSC-045, ¶ 4, 108 N.M. 633, 776 P.2d 1252 ("We presume that the [L]egislature is well informed as to existing statutory and common law . . . when it enacts a new statute.").

**{65}**	Applying Section 12-2A-20(A) to the compensation provision, the meaning of "any other property" may be limited by the series or to the category established by "health care supplies" and "health facility," both of which are statutorily defined. *See §* 12-10A-3(D)-(E). *Health care supplies* are defined as

> medication, durable medical equipment, instruments, linens or *any other material that the state may need to use in a public health emergency, including supplies for preparedness, mitigation and recovery*.

Section 12-10A-3(D) (emphasis added). *Health facility* is defined as

(1)	a facility licensed by the state pursuant to the provisions of the Public Health Act;

(2)	a nonfederal facility or building, whether public or private, for-profit or nonprofit, that is used, operated or designed to provide health services, medical treatment, nursing services, rehabilitative services or preventive care;

(3)	a federal facility, when the appropriate federal entity provides its consent; or

(4)	 the following properties *when they are used for, or in connection with, health-related activities*:

(a)	laboratories;

(b)	research facilities;

(c)	pharmacies;

(d)	laundry facilities;

(e)	health personnel training and lodging facilities;

> (f)     patient, guest and health personnel food service facilities; and
>
> (g)     offices or office buildings used by persons engaged in health care professions or services.

Section 12-10A-3(E) (emphasis added). We note that both statutory definitions include their own general catch-all terms, emphasized in this paragraph, that allow flexible application to meet the purposes of the PHERA under Section 12-10A-2.

**{66}**     Applying ejusdem generis to the foregoing statutory definitions, we conclude that "any other property" within Section 12-10A-15(A) was legislatively intended to be a catch-all limited within the category of physical property that is directly taken or appropriated by the State and used for, or in connection with, a public health emergency.

**{67}**     The Real Parties' arguments regarding rules of construction do not overcome this reading for two reasons. First, their broad reading of "any other property" would include purely financial losses incurred by businesses impacted by the PHOs' occupancy limitations and closures. Such an interpretation would include "any other property" almost without limitation and would thus render "health care supplies" and "health facility" surplusage or superfluous. *See State v. Javier M.*, 2001-NMSC-030, ¶ 32, 131 N.M. 1, 33 P.3d 1 ("[A] statute must be construed so that no part of the statute is rendered surplusage or superfluous." (internal quotation marks and citation omitted)).

**{68}**     Second, the Real Parties assert that a narrow reading under ejusdem generis "would potentially yield an absurd result" by precluding the State from taking or appropriating property that is necessary to combat the public health crisis but is also outside the statutory definitions above. The Real Parties' own illustration refutes their argument, as appropriation of a refrigerated truck, or even an ice cream truck,[24] to transport vaccines could plausibly qualify under such a narrow reading. Under the hypothetical, the underlying purpose of the appropriation would presumably qualify for "use in a public health emergency," and the vehicle could plausibly be read within the parameters of 12-10A-3(D). Without ruling on a hypothetical, we nonetheless find the Real Parties' argument unpersuasive.

**{69}**     Our narrow reading above is consistent with legislative intent to provide flexible authority without expanding the definition of "any other property" beyond its series of specific words. *See* § 12-10A-15(A); § 12-2A-20(A).

---

24This is in fact a notion that has entered the national conversation. *See, e.g.*, https://www.youtube.com/watch?v=-UYcmOdo5yE (last visited May 3, 2021).

2.  **Analysis of the PHERA's obvious spirit or reason, as well as its consequences, supports a narrow interpretation of the compensation provision**

**{70}** The Real Parties' broad interpretation of "any other property" reflects an adherence to the literal use of the words that (a) contradicts the obvious spirit or reason of the PHERA and (b) would lead to absurdity.

a.  **Under the PHERA's obvious spirit or reason, the compensation provision as a due process protection does not warrant a broad application**

**{71}** The PHERA's obvious spirit or reason is indicated by its statement of purposes in Section 12-10A-2, to prepare and provide for a public health emergency while also protecting civil rights and the liberties of individual persons.

**{72}** In *Reeb*, we concluded that the penalty provision at issue was broadly applicable under both the special powers of the Secretary of Health and the general powers of her office, reflecting "the legislative intent . . . to permit enforcement of all measures lawfully taken under the PHERA." 2021-NMSC-006, ¶¶ 29, 35-37. This broad interpretation served "[t]he spirit and intent of the Act." *Id.* ¶ 35. In contrast, the compensation provision is confined within the PHERA, as one of the Act's explicit due process protections directly applicable to its "most intrusive measures (e.g. isolation, quarantine, and seizure of goods or property)." *Id.* ¶ 32. As an explicit due process protection, the provision of "just compensation [due] to the owner" under Section 12-10A-15(A) serves the obvious spirit or reason of the PHERA by ensuring the Act's constitutionality even when the government takes or appropriates property under the Act. *See id.* ¶ 32.

**{73}** Thus, the penalty provision and the compensation provision serve different functions with different scopes under the PHERA. The compensation provision is a discrete and confined component of the Act predicated on the PHERA's special powers, whereas the penalty provision is applicable under both the general and special powers to ensure that the PHERA "shall not be construed to limit specific enforcement powers enumerated" therein. Section 12-10A-19(B). "The PHERA conveys broad and concurrent authority to coordinate a response to a public health emergency, and its penalty provision is explicitly 'in addition to' remedies available under other statutes or the common law." *Reeb*, 2021-NMSC-006, ¶ 40 (quoting § 12-10A-19(B), (C)).

**{74}** For these reasons, the Real Parties' argument does not avail them of a compensation provision that warrants the same liberal construction as the penalty provision.

b.  **Weighing the consequences, a broad interpretation of the compensation provision would result in absurdity**

**{75}** As we discussed above, the Real Parties' broad construction would render "any other property" almost without limitation. Such a reading reflects an adherence to the literal use of the words in question that would lead to an absurdity: unlimited liability authorized by the Legislature. Because a public health emergency can affect the entire

population, anyone and everyone could be a potential claimant under the Real Parties' interpretation, even under far less restrictive measures than the PHOs. It is simply not credible that the Legislature in enacting the PHERA intended for such a potential raid on the public wealth while simultaneously granting broad powers to protect the public health. Such an absurdity weighs heavily against the broad construction of Section 12-10A-15 proposed by the Real Parties. *See* § 12-2A-18(A)(3) ("A statute or rule is construed, if possible, to . . . avoid an unconstitutional, absurd or unachievable result.").

**{76}** Applying our foregoing interpretation of "any other property," the business restrictions in the PHOs to date, which do not include physical seizure of property, cannot support a claim for just compensation under Section 12-10A-15.

### 3. Claimants under Section 12-10A-15(A) must exhaust administrative remedies under Section 12-10A-15(B)

**{77}** Petitioners argue under *Estate of McElveny v. State ex rel. Dep't of Tax'n & Revenue*, 2017-NMSC-024, ¶ 23, 399 P.3d 919, that "[t]he failure to exhaust administrative remedies under Section 12-10A-15(B) . . . forecloses any right to judicial relief under Section 12-10A-15(A)." We agree.

**{78}** The Real Parties cite no legal authority in their briefing on this issue, so we do not consider their arguments. *Wilburn v. Stewart*, 1990-NMSC-039, ¶ 18, 110 N.M. 268, 794 P.2d 1197 ("Issues raised in appellate briefs that are unsupported by cited authority will not be reviewed by us on appeal."); *Adoption of Doe v. Lee*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority. We therefore will not do this research for counsel.").

**{79}** Nevertheless, we provide the following guidance for the trial courts under our writ of superintending control. Section 12-10A-15(B) prescribes the administrative process for claimants under Section 12-10A-15(A). The statute is unambiguous that such process shall initiate through a "preliminary determination" by the Attorney General of "whether or not compensation is due," which the "owner of health care supplies, a health facility or any other property" may appeal. Section 12-10A-15(B). Were they entitled to compensation, we cannot excuse the Real Parties from their statutory duty to exhaust administrative remedies. *McElveny*, 2017-NMSC-024, ¶ 23 ("If a statute explicitly requires a party to exhaust particular remedies as a prerequisite to judicial review . . . the statutorily mandated exhaustion requirements are jurisdictional." (omission in original) (internal quotation marks and citation omitted)).

## III.    CONCLUSION

**{80}** For the foregoing reasons, we grant a writ of superintending control ordering the district courts to comply with the holding of this opinion, namely, that the PHOs to date cannot support a claim for just compensation under either Article II, Section 20 of the New Mexico Constitution or Section 12-10A-15 of the PHERA. In addition, claimants under Section 12-10A-15(A) must exhaust administrative remedies under Section 12-

10A-15(B), (C) before seeking judicial relief. We hereby vacate our previously issued stay, and therefore the underlying litigation may proceed, consistent with this opinion, before the district courts.

**{81}   IT IS SO ORDERED.**

**C. SHANNON BACON, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**BARBARA J. VIGIL, Justice**

**DAVID K. THOMSON, Justice**

**MICHAEL D. BUSTAMANTE, Judge, Retired**
**Sitting by designation**